OPINION
 

 By the Court,
 

 Maupin, J.:
 

 Pursuant to NRAP 5, the United States Bankruptcy Court for the District of Nevada has certified five questions to this court concerning the scope of Nevada’s earning exemption statute, NRS 21.090(l)(g).
 

 FACTS
 

 The Christensens
 

 Chad and Tina Christensen are debtors under Chapter 7, Title 11 of the United States Code. Stan Pack is the duly appointed trustee of the bankruptcy estate.
 

 At the time relevant to their filing on May 12, 2004, the Christensens owned four bank accounts with respective balances of $95.60, $100.11, $154.67, and $539.34, for a total of $889.72. In the normal course of the bankruptcy proceedings, Mr. Pack requested that the Christensens turn all of these funds over to him as property of the bankruptcy estate. Thereafter, the Christensens timely amended their Schedule C, claiming that 75 percent of these funds were exempt from execution under NRS 21.090(l)(g), which concerns exemptions for earnings. Mr. Christensen subsequently submitted an affidavit swearing that the sole source of the funds in all of the accounts, including a $1,000.00 deposit on May 11, 2004, was earnings from his employment. Mr. Pack filed an objection, claiming that the Christensens lost the exemption upon payment of the earnings, and certainly upon deposit of the funds.
 

 
 *1312
 
 The bankruptcy court held a hearing on June 1, 2005, on the issue of the wage exemption. Shortly thereafter, on June 6, 2005, the Governor of Nevada signed Senate Bill 173 (S.B. 173), which amended NRS 21.090(l)(g). The amendments clarify that proceeds of exempt earnings retain the exemption once deposited into a debtor’s bank account.
 

 The parties submitted briefs to the bankruptcy court concerning the effect of S.B. 173 upon NRS 21.090(l)(g), in light of our case authority that an amendment of a statute of “doubtful interpretation ... is persuasive evidence of what the Legislature intended by the [original] statute.”
 
 [2]
 
 Mr. Pack argued that the amendments, if applicable as a clarification of the previous version of the statute, only applied to the deposit from the most recent pay period before filing. The Christensens argued in response that NRS 21.090(l)(g), as clarified through the amendments, allowed them to permanently retain 75 percent of the funds on deposit.
 

 Edmondson
 

 On July 1, 2005, Sharon Edmondson filed a voluntary petition for bankruptcy, seeking relief under Chapter 7 of the Bankruptcy Code. The bankruptcy court duly appointed James Lisowski as trustee. Believing that her bank account balance was $1,050.00, Ms. Edmondson claimed an exemption of $787.50 (or 75 percent of the $1,050.00) on Schedule C of her petition. The parties later stipulated that the available balance in the account on July 1, 2005, was $1,322.62, due to outstanding transactions at the time of filing.
 

 Ms. Edmondson receives a biweekly salary by direct deposit to the bank account at issue here. She alleged that the sole source of the funds on deposit in her checking account, including a direct deposit of $1,678.56 on June 30, 2005, was earnings. Statements for her checking account, however, reveal deposits from an unidentified source, and the parties have not stipulated that the balance in her account is directly traceable to disposable earnings.
 

 Mr. Lisowski filed an objection to the claimed exemption, asserting that amended NRS 21.090(l)(g) applies on a restricted basis to earnings from the most recent week, rather than to any biweekly pay period.
 

 Sokolowski
 

 On July 1, 2005, Angela Sokolowski filed a voluntary petition for bankruptcy, seeking relief under Chapter 7 of the Bankruptcy Code. The bankruptcy court duly appointed Mr. Lisowski as trustee. Ms. Sokolowski maintained three bank accounts which, at
 
 *1313
 
 the time relevant to her filing, reflected account balances of $929.44, $478.50, and $284.01, totaling $1,691.96. Ms. Sokolowski ultimately claimed 75 percent of $1,691.96, or $1,268.98, as exempt under NRS 21.090(l)(g).
 

 Ms. Sokolowski’s employer pays her on a semi-monthly basis by direct deposit to her primary checking account. Bank statements indicate that Ms. Sokolowski’s employer directly deposited $862.32 into her account on June 21, 2005. This was her last pre-petition paycheck. The parties stipulated that the funds in each of Ms. Sokolowski’s accounts are directly traceable to such deposits.
 

 Mr. Lisowski filed an objection to Ms. Sokolowski’s claimed exemption. He asserted that, under the amended statute, only earnings from the most recent week, not the semi-monthly pay period, are subject to exemption.
 

 In relation to the issues presented in these cases, the bankruptcy court certified the following five questions to this court:
 

 1. Does NRS 21.090(l)(g), as in effect before July 1, 2005, apply only to protect unpaid earnings from partial garnishment, or does the exemption extend to property that can be identified as direct proceeds of earnings?
 

 2. If NRS 21.090(g) extends to the direct proceeds of exempt earnings in deposit accounts, does it protect only the proceeds of the most recent deposit or does it protect any and all deposits?
 

 3. If NRS 21.090(l)(g) extends to direct proceeds of exempt earnings in deposit accounts beyond the most recent pay period or workweek, for how long does the exemption continue, and does it also extend to subsequent forms of proceeds?
 

 4. If NRS 21.090(l)(g) extends to direct proceeds of exempt earnings in deposit accounts, does the commingling of such proceeds in that deposit account with other, nonexempt funds, destroy any exemption?
 

 5. If NRS 21.090(l)(g) extends to direct proceeds of exempt earnings in deposit accounts in which the proceeds have been commingled, how does Nevada law identify which portion of the deposit account is exempt?
 

 We now address each question presented by the bankruptcy court in turn.
 

 DISCUSSION
 

 Through its order certifying questions to this court, the United States Bankruptcy Court for the District of Nevada seeks a definitive construction of Nevada’s wage exemption statute, NRS
 
 *1314
 
 21.090(l)(g).
 
 [3]
 
 We liberally and beneficially construe our state exemption statutes in favor of the debtor.
 
 [4]
 

 The Nevada wage garnishment exemption has roots in this State’s Constitution, which provides:
 

 The privilege of the debtor to enjoy the necessary comforts of life shall be recognized by wholesome laws, exempting a reasonable amount of property from seizure or sale for payment of any debts . . . .
 
 [5]
 

 To achieve this constitutional end, the Nevada Legislature enacted the first wage garnishment exemption statute in 1911.
 
 [6]
 
 While no legislative history exists suggesting the purpose of the original wage garnishment exemption statute, “it is apparent that it was intended to promote the basic purpose of the exemption statutes in general: namely, to preserve part of the debtor’s earnings for the benefit of himself and his family.”
 
 [7]
 

 The Legislature ultimately elected to “opt-out” of the federal exemption scheme found in § 522(d) of the Bankruptcy Code
 
 [8]
 
 and set forth various forms of property exempt from execution in NRS 21.090. NRS 21.090(l)(g) specifically exempts from execution a particular amount of the debtor’s earnings. Before 2005, NRS 21.090(l)(g) provided that for any pay period, 75 percent of a judgment debtor’s disposable earnings were exempt from execution:
 

 1. The following property is exempt from execution, except as otherwise specifically provided in this section:
 

 (g) For any pay period, 75 percent of the disposable earnings of a judgment debtor during that period, or for each week of the period 30 times the minimum hourly wage prescribed by section 6(a)(1) of the federal Fair Labor Standards Act of 1938, 29 U.S.C. § 206(a)(1), and in effect at the time the earnings are payable, whichever is greater. Except as otherwise provided in paragraphs (n), (r) and (s), the exemption provided in this paragraph does not apply in the case of any order of a court of competent jurisdiction for the support of any person, any order of a court of bankruptcy or of any debt due for any state or federal tax. As used in this
 
 *1315
 
 paragraph, “disposable earnings” means that part of the earnings of a judgment debtor remaining after the deduction from those earnings of any amounts required by law, to be withheld.
 

 The 2005 Nevada Legislature amended NRS 21.090(l)(g) by enacting S.B. 173, effective July 1, 2005. This amendment, in relevant part, changed the term “pay period” to “workweek,” made exempt 75 percent of earnings during that week, and defined “earnings”:
 

 1. The following property is exempt from execution, except as otherwise specifically provided in this section ffj
 
 or federal law:
 

 (g) For any {pay period;]
 
 workweek,
 
 75 percent of the disposable earnings of a judgment debtor during that [period, or for each week-of the- period 30]
 
 week, or 50
 
 times the minimum hourly wage prescribed by section 6(a)(1) of the federal Fair Labor Standards Act of 1938, 29 U.S.C. § 206(a)(1), and in effect at the time the earnings are payable, whichever is greater. Except as otherwise provided in paragraphs (n), (r) and (s), the exemption provided in this paragraph does not apply in the case of any order of a court of competent jurisdiction for the support of any person, any order of a court of bankruptcy or of any debt due for any state or federal tax. As used in this paragraph [, “disposable] :
 

 (1) “Disposable
 
 earnings” means that part of the earnings of a judgment debtor remaining after the deduction from those earnings of any amounts required by law Li to be withheld.
 

 (2) “Earnings” means compensation paid or payable for personal services performed by a judgment debtor in the regular course of business, including, without limitation, compensation designated as income, wages, tips, a salary, a commission or a bonus. The term includes compensation received by a judgment debtor that is in the possession of the judgment debtor, compensation held in accounts maintained in a bank or any other financial institution or, in the case of a receivable, compensation that is due the judgment debtor.
 

 [9]
 

 Because of the 2005 amendments, the questions certified implicate both versions of our wage exemption statute. The original statute applies in the Christensens’ matter, and the amended statute applies in Ms. Edmondson’s and Ms. Sokolowski’s matters.
 

 
 *1316
 

 Question no. 1
 

 The first issue certified by the bankruptcy court is whether the pre-July 1, 2005 version of NRS 21.090(l)(g) applies only to protect unpaid earnings from partial garnishment, or whether the exemption extends to property that can be identified as direct proceeds of earnings.
 
 [10]
 
 The trustees assert that, under the original version, once the earnings were deposited into a debtor’s bank account, they lost the exemption protection because they became the proceeds of earnings.
 
 [11]
 
 We disagree.
 

 We have not directly addressed this issue before. However, over 40 years ago, in
 
 Security National Bank
 
 v. McColl,
 
 [12]
 
 we recognized that veteran’s benefits retained exempt status under federal law even after being deposited into a bank account.
 
 [13]
 
 In this, we relied upon the United States Supreme Court decision in
 
 Porter v. Aetna Casualty Co.
 
 ,
 
 [14]
 
 in which the Court held that a deposit of veterans’ benefits in an interest-bearing account with a federal savings and loan association was not an “investment” when the account was the sole source of funds available to meet the veteran’s needs. In reaching this determination, the Court concluded that Congress
 

 intended that veterans in the safekeeping of their benefits should be able to utilize those normal modes adopted by the
 
 *1317
 
 community for that purpose — provided the benefit funds, regardless of the technicalities of title and other formalities, are readily available as needed for support and maintenance, actually retain the qualities of moneys, and have not been converted into permanent investments.
 
 [15]
 

 Other courts addressing similar state wage exemption statutes have echoed the reasoning in
 
 Porter.
 

 [16]
 

 The Iowa Supreme Court has noted that in order to spend earnings, a wage earner often must deposit earnings into a bank account and, if creditors could simply execute on these funds, the protection given would be nullified:
 

 In order to permit a wage earner to enjoy any benefit from the protection afforded by [the wage exemption statute], it is necessary to accord that person a reasonable opportunity to negotiate the paycheck and spend the funds. The commercial realities of modern-day living will frequently require that the funds be first deposited in a bank account in order to achieve that end. If wages intended by law to be exempt from creditors’ claims are only accorded that status in the hands of the debtor’s employer, the protection can be rendered meaningless by creditors levying on the funds in the hands of the debtor or on the debtor’s bank account.
 
 [17]
 

 We concur with the reasoning of the Iowa court and conclude that the purpose of NRS 21.090(l)(g) would be thwarted if earnings lost their exempt status once deposited into a debtor’s bank account.
 

 We also note that our ruling comports with the current practice of the bankruptcy court in this state. Specifically, in the 1996 case of
 
 In re Norris,
 
 the United States Bankruptcy Court for the District of Nevada held that proceeds of earnings in a debtor’s deposit account are exempt when they are directly traceable to an automatic deposit of earnings by the employer into the debtor’s checking account on the day of filing.
 
 [18]
 
 In
 
 Norris,
 
 the debtors claimed as exempt under NRS 21.090(l)(g), 75 percent of the wages deposited directly into the debtor-husband’s bank account on the petition filing date.
 
 [19]
 
 The trustee objected to the exemption, claiming that the funds were commingled with estate property and lost exempt status.
 
 [20]
 
 The bankruptcy court noted that NRS
 
 *1318
 
 21.090(l)(g) was silent on the issue of whether funds retain their exempt status as “‘disposable earnings’ once disbursed to a debtor’s checking account.”
 
 [21]
 
 The court then noted that the historical purpose of the exemption in Nevada, and the apparent purpose of NRS 21.090(l)(g), was “to protect a debtor by permitting him to retain the basic necessities of life so that after the levy of nonexempt property he and his family will not be left destitute.”
 
 [22]
 
 The bankruptcy court concluded that “[a] deposit of the earnings, whether by the debtor or directly by the employer, should not cause the statutorily exempt wages to lose their exempt status as long as the proceeds of the account are traceable to those earnings.”
 
 [23]
 

 Several years later, Federal Bankruptcy Chief Judge Zive followed the reasoning of
 
 Norris
 
 in
 
 In re Shuey.
 

 [24]
 

 In
 
 Shuey,
 
 the employer deposited earnings in a “Savings Plan” in accordance with a contract between the employer and the employee’s union.
 
 [25]
 
 The proceeds on deposit were not immediately available to the employee, thus accumulating in the account for a 13-month period.
 
 [26]
 
 Because of the seasonal nature of the job, the account was intended as a “rainy-day fund” to provide support for the employee during the winter period when there was no regular work.
 
 [27]
 
 Under the contract, the direct proceeds of the earnings were to be made available by the employer to the employee in a future lump-sum payment.
 
 [28]
 
 Thus, the original form of the debtor’s exempt property was a receivable owed by the employer.
 
 [29]
 
 By depositing the earnings into an account for the employee, the employer satisfied its obligation, converting the exempt property into a new form as direct proceeds of the exempt property, which the court also held to be exempt.
 
 [30]
 

 Nothing in the legislative history of the 2005 statutory amendments indicates that the Legislature disapproved of the bankruptcy court’s interpretation of NRS 21.090(l)(g) on this issue.
 
 [31]
 
 Rather,
 
 *1319
 
 the 2005 statutory amendments further support our conclusion that the Legislature intended that exempt earnings retain their exempt status once deposited into a bank account. In this, we note that the Legislature’s recent amendment to Nevada’s wage exemption provisions by S.B. 173 seems to resolve this question for all cases arising on and after July 1, 2005, consistent with
 
 Norris.
 
 Specifically, S.B. 173 now defines exempt earnings as “compensation paid or payable ... [to include] compensation held in accounts maintained in a bank or any other financial institution or, in the case of a receivable, compensation that is due the judgment debtor.”
 

 “Where a former statute is amended, or a doubtful interpretation of a former statute rendered certain by subsequent legislation, it has been held that such amendment is persuasive evidence of what the Legislature intended by the first statute.”
 
 [32]
 
 Given that the 2005 amendments embrace the bankruptcy court’s interpretation of former NRS 21.090(l)(g), we conclude that the amendments manifest the Legislature’s intent to clarify that exempt earnings on deposit remain exempt.
 

 Based on the foregoing analysis, we conclude that NRS 21.090(l)(g), as in effect before July 1, 2005, exempted 75 percent of earnings from garnishment and that the exemption extended to property identified as direct proceeds of earnings.
 

 Question no. 2
 

 The next issue certified by the bankruptcy court is whether NRS 21.090(l)(g), in both its amended and original form, protects only the proceeds of the most recent deposit of earnings, a portion of the deposit, or any and all deposits. The trustee, in each of the cases at issue, contends that the statutory language exempts only deposits of earnings from a particular pay period or workweek.
 
 [33]
 
 
 *1320
 
 The version of the statute in effect before July 1, 2005, exempted the following monies from exposure to garnishment: “[f]or
 
 any
 
 pay period, 75 percent of the disposable earnings during
 
 that
 
 period, or for each week of the period.” (Emphasis added.) The changes effected in S.B. 173 do not shed any light on this question. Rather, S.B. 173 only substitutes the term “week” for the term “pay period.”
 

 It is clear that, in amending the statute, the Legislature primarily intended
 
 [34]
 
 to change the result of our 1999 decision in
 
 In re Galvez
 

 [35]
 

 In
 
 Galvez,
 
 the debtor filed for bankruptcy, and the trustee requested that the debtor turn over funds from a real estate commission that remained in escrow at the time of the bankruptcy petition.
 
 [36]
 
 The debtor claimed an exemption of 75 percent of the commission under NRS 21.090(l)(g).
 
 [37]
 
 Relying on the statutory term “period,” we held that NRS 21.090(l)(g) only exempts “earnings” that are periodic in nature and, thus, did not apply to a real estate commission earned by an independent contractor who worked as a licensed real estate agent.
 
 [38]
 

 We note that while the Legislature removed the word “periodic” to avoid the results of
 
 Galvez,
 
 it retained the modifier “any.” The dictionary defines “any” as “one, some, every, or all without specification.”
 
 [39]
 
 The retention of the modifier “any” in this provision does not reflect an intent to restrict the scope of the exemption as suggested by the trustees. If the Legislature intended to exempt only one week of a debtor’s earnings from execution, it would have expressly embraced such a limitation. And to the extent that the statute is arguably ambiguous, we must construe it liberally and beneficially in favor of the debtors.
 
 [40]
 
 Consequently, we conclude that NRS 21.090(l)(g) protects the proceeds of any deposits of earnings.
 

 
 *1321
 

 Question no. 3
 

 Given our conclusion that NRS 21.090(l)(g) in both its amended and original form protects the proceeds of all deposits of earnings, we must address the third issue certified by the bankruptcy court regarding how long the exemption continues and whether it also extends to subsequent forms of proceeds. NRS 21.090(l)(g) does not directly address this issue, leaving this court free to seek a sound result consistent with the broad policy considerations that weigh on the issue.
 

 Ms. Edmondson and Ms. Sokolowski assert that any limitation on the exemption denies a debtor the means “to enjoy the necessary comforts of life” as required by our State Constitution.
 
 [41]
 
 The trustees counter that if the exemption extends indefinitely, it could shield large amounts of money beyond what is necessary for these purposes.
 

 As previously noted, our state’s exemption provisions do not directly speak to any temporal limitations on how long an asset may remain exempt, as do other states’ codes.
 
 [42]
 
 Nor has our case law incorporated a temporal standard by which distributions may lose their exemption, as has been found in other states.
 
 [43]
 
 As further noted, however, when faced with a similar problem with respect to veterans’ benefits, the United States Supreme Court held in
 
 Porter v. Aetna Casualty Co.
 
 that veterans’ benefits deposited in a bank account remained exempt so long as the benefits “remained subject to demand and use as the needs of the veteran for support and maintenance required” and the “exemption spent its force when the benefit funds Tost the quality of moneys’ and were converted into ‘permanent investments.’ ”
 
 [44]
 

 As NRS 21.090(l)(g) does not provide any temporal restriction as found in other states’ codes, we likewise conclude that earnings deposited in a bank account remain exempt so long as the benefits
 
 *1322
 
 remain subject to demand and use as the needs of the debtor for the support and maintenance required. The Legislature’s failure to provide a temporal limitation suggests that the Legislature intended the exemption to extend indefinitely as long as, in line with our discussions concerning questions four and five, below, the exempt funds are reasonably susceptible to being traced by a recognized accounting method. This result is consistent with a construction that favors the benefit of the debtor.
 

 With respect to the related question concerning whether the exemption also extends to subsequent forms of proceeds, we answer this question in the negative. While we will liberally construe exemption statutes in favor of the debtor, it is not within our power to enlarge or extend the provisions of the legislative grant. NRS 21.090(1) sets forth various forms of property exempt from execution, such as declared homesteads, pension plans, individual retirement accounts, automobiles, prosthetics, etc., and are limited as stated in that measure.
 
 [45]
 
 Going further, NRS 21.090(l)(g) is restricted to traceable proceeds as discussed below. Thus, property which in itself is not statutorily exempt from execution does not acquire an exempt character because it is purchased with the proceeds of exempt earnings.
 
 [46]
 

 Going further, the legislative purpose of allowing wages to retain their exempt character is to facilitate payment of ordinary living expenses. Once a debtor converts the proceeds of exempt earnings to a permanent investment, the legislative purpose of NRS 21.090(l)(g) is no longer at play.
 

 As this court must liberally and beneficially construe NRS 21.090(l)(g) in favor of the debtor, we conclude that NRS 21.090(l)(g) extends to protect the proceeds of earnings from any workweek or pay period so long as it remains subject to demand and use as the needs of the debtor for required support and maintenance.
 

 Question no. 4
 

 The fourth question certified to this court is whether commingling proceeds of exempt earnings with other, nonexempt funds, destroys the exemption. As the bankruptcy court noted in
 
 Norris,
 
 NRS 21.090(l)(g) does not expressly state that exempt funds lose their exempt status when commingled with nonexempt funds.
 
 [47]
 
 
 *1323
 
 This wage garnishment exemption statute is the result of a legislative drafting process that began in 1911 and has been the subject of numerous legislative revisions since that time.
 

 One basic tenet of statutory construction dictates that, if the legislature includes a qualification in one statute but omits the qualification in another similar statute, it should be inferred that the omission was intentional.
 
 [48]
 
 Comparing NRS 21.090(l)(g) to NRS 612.710(2), which provides that unemployment compensation benefits are exempt from any remedy for the collection of all debts “if they are not mingled with other money of the recipient,” we note that NRS 21.090(l)(g) contains no such restriction. Because NRS 21.090(l)(g) contains no restriction like that found in NRS 612.710(2), and because both are similar exemption measures, we conclude that the Legislature intended to preserve the exempt status of earnings that are commingled with nonexempt funds under NRS 21.090(l)(g).
 

 Going further, the trustees apparently concede that tracing may be appropriate when the debtor has made no withdrawals from the account containing both exempt and nonexempt funds. While the trustees contend that tracing in all other circumstances would be impractical, the overwhelming majority of courts hold that exempt funds only lose their exempt status when commingled with nonexempt funds if tracing is not possible.
 
 [49]
 
 And it defies logic that a debtor, such as Ms. Edmondson, should lose the exemption simply by commingling funds when tracing is feasible. Accordingly, we agree with the majority position and conclude that the commingling of the proceeds of exempt earnings with nonexempt funds does not destroy the exemption so long as tracing is possible.
 

 Question no. 5
 

 Having concluded that commingling proceeds of exempt earnings with nonexempt funds does not destroy the exemption, we now
 
 *1324
 
 address the last certified question: how would Nevada law allow identification,
 
 i.e.,
 
 tracing, of the proceeds of exempt earnings. Tracing requires some arbitrary form of dividing the commingled intangible assets to determine the extent to which exempt and/or nonexempt status is attributed to the funds remaining in the deposit account.
 

 The debtors urge us to take a case-by-case approach rather than adopting one particular method of tracing. Such an approach, however, would lead to greater litigation between debtors and trustees over the appropriate tracing method to be utilized. In the interest of judicial economy, we therefore conclude that it is appropriate to adopt one method of tracing.
 

 As NRS 21.090(l)(g) is silent on the appropriate method of tracing, we must turn to common-law principles. Other jurisdictions generally apply one of the following four methods borrowed from trust and accounting law to trace funds: the lowest intermediate balance rule (LIBR) approach; the pro-rata approach; the last-in, first-out (LIFO) approach; and the first-in, first-out (FIFO) approach.
 
 [50]
 

 LIBR is a tracing method derived from the law of trusts.
 
 [51]
 
 Under this approach, “the exempt fund may not exceed the lowest balance occurring at any time between the deposit of the exempt amount of money and the time of levy.’ ’
 
 [52]
 
 New deposits do not replenish the
 
 *1325
 
 original exempt fund, although the new deposits may themselves be exempt. Courts, however, use LIBR most often when tracing with respect to conversion actions, and thus, this method is not particularly useful within the context of the wage exemption statute.
 
 [53]
 

 Under the pro-rata approach, withdrawals from an account containing exempt and nonexempt funds are to be attributed to the several funds in proportion to their respective sizes at the time of the withdrawals.
 
 [54]
 
 Thus, if a debtor’s bank account contains $100 of exempt funds and $500 of nonexempt funds, and the debtor proceeds to make a withdrawal, one-sixth of the withdrawal is assumed to have come from the exempt funds and five-sixths of the withdrawal is assumed to come from the nonexempt funds.
 

 FIFO assumes that the first funds deposited in a commingled account are also the first funds withdrawn or paid out of that account.
 
 [55]
 
 By way of example, assume a debtor deposits $100 of earnings and several days later deposits $500 from a nonexempt source. The debtor then withdraws $150. Using the FIFO method, the debtor exhausts $100 of the funds from earnings, and only $50 of the funds from the nonexempt source. In contexts similar to situations presented by the debtors in these cases, several courts have used FIFO to trace exempt funds in a commingled account.
 
 [56]
 
 LIFO, in contrast, assumes that the last funds deposited in a commingled account are the first funds withdrawn or paid out of that account. Using the LIFO accounting method, the $150 withdrawal is assumed to come entirely from the nonexempt $500.
 

 We conclude that LIBR and LIFO are less workable approaches and inconsistent with expeditious and simple enforcement. While the pro-rata approach seems to be the most simple, it does very little to preserve the rights of creditors to execute against nonexempt funds. Accordingly, we conclude that FIFO best serves the dual interests of NRS 21.090(l)(g) of assuring that the debtors have the necessities of life while doing as little harm to the creditors as possible. Thus, in answer to certified question no. 5, we adopt FIFO as the approved method for tracing exempt funds from private debtor accounts.
 

 
 *1326
 

 CONCLUSION
 

 Based on the foregoing analysis, we conclude that NRS 21.090(l)(g), in both its original and amended form, exempts the proceeds of any and all deposits of earnings in a debtor’s bank account. Once exempt, the proceeds of exempt earnings retain the exemption even if commingled with nonexempt funds unless tracing is not possible or the proceeds take on the form of an investment. Finally, we adopt FIFO as the appropriate method to trace exempt proceeds.
 

 Becker, Gibbons, Douglas, Hardesty and Parraguirre, JJ., concur.
 

 2005 Nev. Stat., ch. 290, § 5, at 1015.
 

 [2]
 

 Sheriff v. Smith,
 
 91 Nev. 729, 734, 542 P.2d 440, 443 (1975).
 

 [3]
 

 Diamond
 
 v.
 
 Swick,
 
 117 Nev. 671, 674, 28 P.3d 1087, 1089 (2001).
 

 [4]
 

 See Jackman
 
 v.
 
 Nance,
 
 109 Nev. 716, 857 P.2d 7 (1993).
 

 [5]
 

 Nev. Const. art. 1, § 14.
 

 [6]
 

 See In re Galvez,
 
 115 Nev. 417, 419, 990 P.2d 187, 188 (1999).
 

 [7]
 

 In re Norris,
 
 203 B.R. 463, 466 (Bankr. D. Nev. 1996).
 

 [8]
 

 NRS 21.090(3).
 

 [10]
 

 As debtors Edmondson and Sokolowski filed for bankruptcy on July 1, 2005, this issue only involves the Christensens.
 

 [11]
 

 The trustees additionally assert that NRS 21.090(l)(g), in both its original and amended form, does not apply in the bankruptcy context generally because NRS 21.090(l)(g) provides that the wage exemption “does not apply in the case of any order of a court of competent jurisdiction for the support of any person, any order of a court of bankruptcy or of any debt due for any state or federal tax.” If the trustees’ interpretation is correct, then all of the funds in the debtors’ respective bank accounts are property of the bankruptcy estate. The debtors would then have no means to pay for their basic necessities until they receive their first post-petition paycheck. The Legislature could not have intended such a result. Going further, the bankruptcy court has enforced the wage exemption statute in the bankruptcy context,
 
 see Norris,
 
 203 B.R. 463, and nothing in the legislative history for the 2005 statutory amendments suggests that the Legislature disagreed with the bankruptcy court’s application of the statute.
 

 [12]
 

 79 Nev. 423, 385 P.2d 825 (1963).
 

 [13]
 

 Security National Bank
 
 states:
 

 “Payments of benefits due or to become due under any law administered by
 
 the Veterans’
 
 Administration . . . made to, or on account of, a beneficiary . . . shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary.’ ’
 

 Id.
 
 at 425, 385 P.2d at 826 (quoting 38 U.S.C. § 3101(a)).
 

 [14]
 

 370 U.S. 159 (1962).
 

 [15]
 

 Id.
 
 at 162.
 

 [16]
 

 See, e.g., MidAmerica Sav. Bank v. Miehe,
 
 438 N.W.2d 837, 839 (Iowa 1989);
 
 Matthews
 
 v.
 
 Lewis,
 
 617 S.W.2d 43, 45 (Ky. 1981).
 

 [17]
 

 MidAmerica Sav. Bank,
 
 438 N.W.2d at 839.
 

 [18]
 

 203 B.R. 463, 467-68 (Bankr. D. Nev. 1996).
 

 [19]
 

 Id.
 
 at 464.
 

 [20]
 

 Id.
 
 at 465.
 

 [21]
 

 Id.
 

 [22]
 

 Id.
 
 465-66.
 

 [23]
 

 Norris,
 
 203 B.R. at 466.
 

 [24]
 

 No. 03-52753, 2005 Bank. LEXIS 1011 (Bankr. D. Nev. June 8, 2005).
 

 [25]
 

 Id.
 
 at *1-3.
 

 [26]
 

 Id.
 

 [27]
 

 Id.
 

 [28]
 

 Id.
 

 [29]
 

 2005 Bank. LEXIS at *1-3.
 

 [30]
 

 Id.
 
 at *13.
 

 [31]
 

 Philip Goldstein, in his address to the Assembly Committee on the Judiciary on amending NRS 21.090(l)(g) to redefine income, stated:
 

 [The purpose of] NRS 21.090, paragraph (g), is to redefine income. We know that 75 percent of a person’s paycheck is protected from garnishment of execution. The problem is, we have a lot of people in the state
 
 *1319
 
 of Nevada that don’t receive ordinary income. They could be receiving tips or commissions, or they could be a real estate or mortgage broker who receives money out of escrow every time a sale closes. Those funds are not presently protected under the law. Someone who does not receive an ordinary paycheck on a weekly or biweekly basis has no protection for their income. They may find themselves at risk of not being able to pay the rent, mortgage, or car payment.
 
 We’re not looking to protect anything greater than what is currently protected, but we want to include those people who are not receiving a salary.
 

 Hearing on S.B. 173 Before the Assembly Comm, on the Judiciary, 73d Leg., 34 (Nev., May 12, 2005) (emphasis added).
 

 [32]
 

 Sheriff v.
 
 Smith, 91 Nev. 729, 734, 542 P.2d 440, 443 (1975).
 

 [33]
 

 Under either the original or revised NRS 21.090(l)(g), the effect of the statutory language is clear outside the context of bankruptcy; creditors may
 
 *1320
 
 garnish a limited amount of earnings from individual pay periods; although nothing prevents them from garnishing earnings in multiple pay periods or workweeks. However, within the context of bankruptcy, post-petition earnings are not property of the estate of a Chapter 7 debtor. 11 U.S.C. § 541(a)(6) (2000);
 
 see also Norris,
 
 203 B.R. at 465 n.2.
 

 [34]
 

 See
 
 Hearing on S.B. 173 Before the Senate Judiciary Comm., 73d Leg., 13 (Nev., March 16, 2005). The other primary purpose of amending this particular provision was to increase the protection for the lowest income worker from 30 times the minimum wage to 50 times the minimum wage.
 
 See
 
 Hearing on S.B. 173 Before the Assembly Comm. on Judiciary, 73d Leg., 21 (Nev., May 17, 2005).
 

 [35]
 

 115 Nev. 417, 990 P.2d 187 (1999).
 

 [36]
 

 Id.
 
 at 418, 990 P.2d at 188.
 

 [37]
 

 Id.
 

 [38]
 

 Id. at 421, 990 P.2d at 190.
 

 [39]
 

 American Heritage Dictionary of the English Language
 
 81 (4th ed. 2000).
 

 [40]
 

 See Jackman v. Nance,
 
 109 Nev. 716, 857 P.2d 7 (1993).
 

 [41]
 

 Nev. Const. art. 1, § 14.
 

 [42]
 

 See, e.g.,
 
 Tex. Prop. Code Ann. § 41.001(c) (Vernon Supp. 2006) (exempting proceeds of a sale of a homestead from seizure for six months after the sale); Cal. Civ. Proc. Code § 704.020 (West 1987) (exempting proceeds from sale of household furnishings for 90 days after receipt).
 

 [43]
 

 See, e.g., In re Delson,
 
 247 B.R. 873, 875-76 (Bankr. S.D. Fla. 2000) (requiring a good-faith intent before sale to reinvest proceeds from sale of homestead within a reasonable time);
 
 In re Caslavka,
 
 179 B.R. 141, 147 (Bankr. N.D. Iowa 1995) (finding that proceeds from sale of homestead are exempt for a reasonable period of time);
 
 Auto Owners Ins. v. Berkshire,
 
 588 N.E.2d 1230 (Ill. App. Ct. 1992) (exempting proceeds traceable to retirement benefits while the debtors use the funds for support).
 

 [44]
 

 Porter,
 
 370 U.S. at 161, 160 (describing the Court’s holding in
 
 Trotter v. Tennessee,
 
 290 U.S. 354 (1933)). Congress adopted the Court’s distinction when it amended the act in question in 1935.
 
 See Porter,
 
 370 U.S. at 160.
 

 [45]
 

 See
 
 NRS 21.090(1).
 

 [46]
 

 See
 
 Iowa Methodist Hospital v. Long,
 
 12 N.W.2d 171, 175 (Iowa 1943).
 

 [47]
 

 Norris,
 
 203 B.R. at 467.
 

 [48]
 

 Id.
 
 (citing
 
 Williams
 
 v.
 
 Matthews,
 
 448 S.E.2d 625 (Va. 1994);
 
 Perlenfein and Perlenfein,
 
 848 P.2d 604 (Or. 1993);
 
 Ex Parte Arascada,
 
 44 Nev. 30, 35, 189 P. 619 (1920)).
 

 [49]
 

 In re Lichtenberger,
 
 337 B.R. 322, 324 (Bankr. C.D. Ill. 2006) (under Illinois law, debtor’s commingling of exempt and nonexempt funds does not transmute the exempt funds into nonexempt assets; however, exempt funds must be reasonably traceable to retain their exempt status);
 
 In re Lubecki,
 
 332 B.R. 256, 260 (Bankr. W.D.N.Y. 2005) (under New York law, commingling of exempt proceeds with nonexempt assets does not preclude tracing of exempt status to appropriate portion of the common fund);
 
 In re Green,
 
 178 B.R. 533, 537 (Bankr. M.D. Fla. 1995) (commingling of nonexempt interest paid by bank on funds from settlement of Chapter 7 debtor’s workers’ compensation case with exempt settlement proceeds did not affect exempt status of settlement
 
 *1324
 
 proceeds where the amount of interest was known);
 
 In re Schlein,
 
 114 B.R. 780, 784 (Bankr. M.D. Fla. 1990) (debtor not entitled to wage exemption due to his failure to trace and properly identify the funds deposited into his checking account).
 

 [50]
 

 In re Lichtenberger,
 
 337 B.R. 322 (Bankr. C.D. Ill. 2006);
 
 see also GMAC v. Norstar Bank, N.A.,
 
 532 N.Y.S.2d 685, 687 (Sup. Ct. 1988).
 

 [51]
 

 Lichtenberger,
 
 337 B.R. at 325 (citing
 
 Brown & Williamson T. Corp. v. First Nat. B. of Blue Island,
 
 504 F.2d 998 (7th Cir. 1974)).
 

 [52]
 

 Cal. Civ. Proc. § 703.080(c) legislative comm. cmt. (West 1987). This comment provides the following example of the operation of the lowest intermediate balance rule:
 

 [S]uppose the judgment debtor has a deposit account in which there is a balance of $400 composed of nonexempt funds. The judgment debtor then makes a deposit of $400 of exempt funds (leaving a balance of $800), a withdrawal of $600 (leaving a balance of $200), and a deposit of $300 of nonexempt funds (leaving a balance of $500). The total exempt funds deposited were $400, but under the lowest intermediate balance rule, the $600 withdrawal reduces first the nonexempt funds and then the exempt funds, leaving $200 of exempt funds. The final $300 deposit does not affect the exempt funds, which remain exempt in the amount of $200, the lowest intermediate balance, despite the final balance of $500.
 

 [53]
 

 Licthenberger,
 
 337 B.R. at 325.
 

 [54]
 

 See United States Fidelity & G. Co. v. Union Bank & T. Co.,
 
 228 F. 448 (6th Cir. 1915);
 
 Gwynn v. Spurway,
 
 28 F.2d 37 (S.D. Iowa 1928).
 

 [55]
 

 Harris J. Diamond, Note,
 
 Tracing Cash Proceeds in Insolvency Proceedings Under Revised Article 9,
 
 9 Am. Bankr. Inst. L. Rev. 385, 413 (2001).
 

 [56]
 

 See Licthenberger,
 
 337 B.R. at 326;
 
 In re Moore,
 
 214 B.R. 628, 631 (Bankr. D. Kan. 1997).