FILED

MAR 10 2017

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | | |
|---|---|---|
| In re: | ) | BAP No.  NV-16-1080-JuKuL |
| | ) | |
| GLOYD GREEN and GAIL HOLLAND, | ) | Bk. No.  2:14-bk-15981-ABL |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| GLOYD GREEN; GAIL HOLLAND, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | M E M O R A N D U M[*] |
| | ) | |
| YVETTE WEINSTEIN, Chapter 7 | ) | |
| Trustee; OSCAR BRANNON HOWARD, | ) | |
| III; TRUMAN HOLT, Trustee for | ) | |
| the Howard Family Trust Dated | ) | |
| August 21, 1998, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Argued and Submitted on February 24, 2017
at Las Vegas, Nevada

Filed - March 10, 2017

Appeal from the United States Bankruptcy Court
for the District of Nevada

Honorable August B. Landis, Bankruptcy Judge, Presiding

_____

Appearances:     Christopher P. Burke argued for appellants Gloyd
Green and Gail Holland; Jerimy L. Kirschner
argued for appellee Truman Holt, Trustee for the
Howard Family Trust Dated August 21, 1998.

_____

Before:  JURY, KURTZ, and LAFFERTY, Bankruptcy Judges.

_____

[*] This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8013-1.

-1-

Debtor-appellants, Gloyd Green (Green) and Gail Holland (Holland) (collectively, Debtors), filed a chapter 11[1] bankruptcy case which was converted to chapter 7. In schedule C, Debtors claimed a homestead exemption in real property located on Loma Portal, Las Vegas, Nevada (Loma Property).

Creditor-appellee, Truman Holt (Holt), Trustee for The Howard Family Trust dated August 21, 1998 (THFT), and Oscar Brannon Howard, III (Howard)[2] objected to Debtors' homestead exemption on the ground that Green had embezzled thousands of dollars from THFT while acting as trustee and used part or all of the funds to purchase the Loma Property. As a result, Holt asserted that under Maki v. Chong, 75 P.3d 376 (Nev. 2003), Debtors were not protected by the homestead exemption.

After an evidentiary hearing, the bankruptcy court orally issued its findings of fact and conclusions of law, sustaining the objection and disallowing Debtors' homestead in its entirety. This appeal followed. For the reasons set forth below, we AFFIRM.

## I. FACTS

### A.   Prepetition Events

Oscar B. Howard, Jr. and Betty J. Howard created THFT and designated themselves as the initial co-trustees. Green, a

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532 and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[2] Howard has not participated in this appeal.

-2-

family friend, was named as a successor trustee upon Oscar and Betty's death or other events not relevant here. Green was also a beneficiary of the trust. Betty died on February 25, 2005. Oscar died on November 5, 2005, survived by his only son. After Oscar's death, Green took over as successor trustee. According to Green, the trust agreement authorized him, among other things, to loan or advance his own funds for any trust purposes.

### 1. The Probate Action

In 2008, suspecting possible misappropriation of trust assets, Holt, Betty's brother and a trust beneficiary, and Howard, also a beneficiary, filed a petition in the probate court for the Eighth Judicial District of Clark County, Nevada. They requested the probate court to assume jurisdiction over THFT, issue an order confirming Green as successor trustee, and compel Green to provide an accounting of THFT's assets and liabilities.

On October 17, 2008, the probate court assumed jurisdiction over THFT, confirmed Green as successor trustee, and ordered him to (1) prepare an inventory of the trust's assets as of November 5, 2005 - the date of Oscar's death - including current values for those assets; (2) provide tax returns filed during that period for the trust or the trustor's estates; (3) pay $2,650 in attorney's fees and costs to Holt's attorney; (4) provide an accounting; and (5) provide a full copy of the complete trust agreement together with all amendments to all beneficiaries of the trust (2008 Order).

Green did not appear at the hearing on the matter, but was personally served with the 2008 Order. He failed to comply. He

did not pay the attorney's fees and costs or provide tax returns for the trust. He provided a copy of the trust agreement which showed the names of the beneficiaries blacked out and which was missing the page setting forth the distribution after the trustors' deaths. He also provided a handwritten inventory of trust assets and values (2008 List). Holt complained that there were significant omissions and misstatements in the 2008 List. The list showed zero income from the date of Oscar's death on November 5, 2005 through October 31, 2008. Expenses were simply listed as $6,274 for property taxes and about $1100 for utilities. Despite repeated requests, Green failed to produce a more detailed inventory or sufficiently answer questions about trust assets.

In March 2009, Holt petitioned the probate court for Green's removal as the successor trustee and for appointment of an interim successor trustee. On April 8, 2009, the probate court entered an order removing Green. The probate court found that Green failed to comply with the 2008 Order — he did not fully account for trust assets, disclose income received by the trust or himself while he was trustee, provide proper tax documents, and pay court ordered costs. The probate court appointed Holt as the successor trustee. The order also prohibited Green from making or completing any transactions involving the trust and compelled him to immediately comply with the 2008 Order by turning over to Holt, within 15 days of the entry of the order, complete copies of the trust agreement and all amendments, and copies of all records of the trust during the term of his administration, including tax returns, check

-4-

registers, cancelled checks, information regarding trust investments, copies of all deeds, mortgages, deeds of trust, promissory notes and similar documents related to trust activities.

On June 8, 2009, Green provided a new accounting of the trust's assets and liabilities to Holt's attorney (2009 List). The 2009 List was different from the 2008 List and stated that THFT held $612,000 in assets, almost a two-fold increase from his previous accounting.

In early 2012, Holt, on behalf of the trust, filed a notice of taking Green's deposition on May 3, 2012. The probate court also issued a "Citation to Appear and Show Cause" related to Green's failure to account for THFT assets or comply with its previous orders. Although served, Green did not appear at the May deposition. Green was served with a second "Citation to Appear and to Show Cause" for a hearing scheduled on September 21, 2012. Again, Green did not appear.

On November 28, 2012, the probate court issued an order granting Holt's motion for enforcement of the forfeiture provision in the trust. That clause provided that a violation of the terms of the trust resulted in a complete forfeiture of property designated to be received by a violating beneficiary under the terms of the trust. The probate court found that Green had failed to provide an accounting and otherwise adhere to the provisions of the trust. Accordingly, the court found that enforcement of the forfeiture clause was proper under the circumstances and thus required Green to return to Holt any prior and current trust property taken by him.

In the forfeiture order, the court made findings that Green had violated the terms of the trust and had failed to carry out his duties as trustee. The probate court found that Green "intentionally obscure[d] the true identity of the beneficiaries by 'blacking out' their names, and then making distributions from the [thrust in accordance which [sic] his desires, rather than the desire of the creators." Green did not appeal the forfeiture order.

## 2. The Civil Action

In August 2012, Holt, in his individual capacity and as successor trustee, filed a civil action against Debtors and their revocable trust alleging ten causes of action, including conversion, embezzlement, breach of fiduciary duty, civil theft and fraud, both actual and constructive (Civil Action). On September 13, 2012, Holt filed a first amended complaint. Debtors failed to answer the complaint. On January 31, 2013, the civil court entered a default judgment against Debtors and their revocable trust.

In the Civil Action, Holt's expert, Ms. Klein, conducted a forensic accounting that traced hundreds of thousands of dollars taken by Green from THFT over several years and assets that should have been returned pursuant to previous court orders. On May 22 and August 28, 2014, the civil court held a prove-up hearing regarding THFT's damages. Green appeared in the Civil Action for the first time at the prove-up hearing and submitted a statement.

Since he appeared late at the first hearing, the civil court agreed to continue the hearing to allow Green to review

-6-

the testimony of Ms. Klein and prepare to cross-examine her. At the continued hearing held on August 28, 2014, Green questioned Ms. Klein about her investigation. Ms. Klein concluded that at least $638,427.07 in funds or assets were either stolen from THFT or lost by Debtors. Ms. Klein testified that there could be additional undiscovered assets and losses, but Green's refusal to cooperate in the investigation made finding additional assets problematic.

At the hearing, the court found that Green had stolen $638,427.07 from the trust over a period of years. The judge indicated his intent to enter a default judgment against Debtors for that amount and a like amount for punitive damages, along with equitable relief in the form of a constructive trust and equitable liens. Holt's counsel later submitted a proposed judgment which the judge signed.

In the judgment, the civil court found Ms. Klein qualified as an expert forensic accounting investigator and found her testimony was both credible and supported by the summaries and voluminous financial records admitted into evidence. The court found that Green was not credible and that his 2008 and 2009 accountings were intentionally and materially misleading, with irreconcilable differences between them and the actual assets of THFT. The civil court also adopted the findings of the probate court — that Green had provided an altered trust document with the names of THFT beneficiaries blacked out in an apparent attempt to call into question the determination of the rights of the other beneficiaries. The civil court further found that the transfer and commingling of trust property with Debtors'

personal property resulted in the complete loss of identity of any of Debtors' property. Finally, the court found that Debtors purchased the Loma Property with cash that had been at some point converted from THFT assets, that the purchase price of the Loma Property was less than the total amount stolen from THFT, and that Debtors could not produce evidence showing the Loma Property was purchased with their personal funds. The court ordered the Loma Property held in constructive trust for THFT and granted Holt and Howard equitable liens on all Debtors' real and personal property. The civil court awarded compensatory damages for $638,427.07 and punitive damages in the same amount. Although the judgment was signed by the civil court judge, it was not entered on the state court docket due to Debtors' bankruptcy filing.

**B. Postpetition Events**

Debtors filed a chapter 11 case on September 3, 2014. Later, the bankruptcy court converted the case to chapter 7.[3] Debtors' schedules showed that they owned free and clear all three of their real properties valued at $455,000 and that they had nearly $1 million in their retirement accounts. They had no secured creditors or unsecured priority creditors. Debtors scheduled Holt and THFT as having an unsecured claim of $1.3 million. In schedule B, Debtors listed the Loma Property with a value of $265,000, and in schedule C they claimed an

_____

[3] On September 30, 2015, the bankruptcy court converted Debtors' case to chapter 7 on the grounds that their bankruptcy filing was not made in good faith. Debtors appealed the conversion order to this Panel. On November 9, 2016, the Panel issued a memorandum decision affirming the conversion order.

exemption in the property under Nev. Rev. Stat. (NRS) 21.090(1)(l) and 115.050 in the amount of $265,000.[4]

### 1.   The Objection To Debtors' Homestead Exemption

In March 2015, Holt filed an objection to Debtors' list of property claimed as exempt, including their homestead exemption in the Loma Property.[5]  Holt argued that the Loma Property was purchased with funds or assets stolen from THFT accounts during Green's time as trustee.  Holt further asserted that at the January 8, 2015 § 341 meeting, his attorney questioned Debtors about the eventual disposition of two specific sets of assets: (1) HSBC and General Electric (GE) bonds held in a THFT account with Zions Direct, Account #5994 (ZD5994) and (2) a $50,000 Certificate of Deposit (CD) purchased by Green from Nevada State Bank, Account #7177 (NSB7177), after Green was notified that he was being removed as trustee.

The ZD5944 account was held as "Gloyd G. Green TEE for the Howard Family Trust DTD 8/21/1998."  A mixture of cash and bonds in this account amounted to $304,962.49.  The GE bonds were worth $45,323.60 and the HSBC bonds were worth $54,186.63.  Green testified that the GE and HSBC bonds were transferred into his own personal account and used to partially pay for the purchase of the Loma Property.

The NSB7117 account was held as "Gloyd G Green The Howard

---

[4] In January 2012, Debtors purchased the Loma Property for $230,000.  Green homesteaded the property on June 20, 2012.

[5] Holt also objected to Debtors' exemption in various retirement accounts.  On March 10, 2016, the bankruptcy court overruled that objection and allowed Debtors' exemption in the retirement accounts in the amount of $960,349.04.

-9-

Family Trust." On March 9, 2009, approximately sixty-five days after he received notice he was being removed as trustee, Green wrote himself a $50,000 check "for CD" from NSB7177. Green testified that the funds from the CD were later used to purchase the Loma Property.

According to Holt, Green's testimony corroborated that $152,300 came from funds held in THFT accounts and was used to pay for the purchase of the Loma Property. Attached to the opposition were the bank statements showing the transfers of amounts associated with the GE and HSBC bonds and CD and a copy of the $50,000 check in the name of Green which was written on the NSB7117 account.

In April 2015, Debtors responded to Holt's objection. Debtors argued that under Nevada law they were allowed to trace the proceeds from the sale of their prior residences for homestead exemption purposes under the holding in Christensen v. Pack (In re Christensen), 149 P.3d 40 (2006). In that regard, Green and Holland sold two houses – one in 1999 and another in 2000, and they also sold a vacant lot. According to Debtors, proceeds from those sales were used to purchase the Loma Property. Debtors also argued that no fraud had been proven and thus their home was protected. Alternatively, Debtors argued that an evidentiary hearing was necessary.

Green submitted a declaration showing that Debtors individually owned three properties that were sold and that the proceeds from the sale of those properties were used to purchase the Loma Property.

In a subsequent declaration, Green declared that he took

-10-

the funds from THFT accounts because he was repaying himself for a previous loan to the trust. Green stated that in January 2006 he loaned his own money to THFT in the approximate sum of $163,000 to pay off a line of credit on Oscar's home located on Race Street in Las Vegas. According to Green, over the next few years, he reimbursed himself the $163,000 that he loaned to the trust.

In reply, Holt argued that § 522(o) prevented Debtors from claiming a homestead exemption in the Loma Property to the extent Debtors acquired the homestead with nonexempt property in the previous 10 years "with the intent to hinder, delay, or defraud a creditor.'" Holt reiterated that Debtors testified under oath at their § 341 meeting that the funds they used to purchase the Loma Property could be directly traced to funds previously held in THFT accounts. Finally, Holt argued that under Maki v. Chong the homestead exemption could not be taken when the proceeds used to purchase the Loma Property could be traced directly to funds obtained through Green's fraud or similar tortious conduct.

## 2. The Evidentiary Hearing

The bankruptcy court held an evidentiary hearing on July 2 and July 15, 2015.[6] Green testified that he transferred more

---

[6] After the evidentiary hearing was set, Debtors amended their schedule C twice. With respect to the Loma Property, the amended schedule C showed that it was held in a revocable trust. Other amendments are not relevant to this matter. On June 2, 2015, Holt filed a second objection to Debtors' claim of exemptions, including the homestead exemption, essentially reiterating points made in the first objection. Debtors filed a
(continued...)

-11-

than $360,000 from THFT accounts or money belonging to THFT into Debtors' personal accounts. He also testified that he loaned the trust approximately $163,000 in 2006, which he used to pay off the line of credit on Oscar's home. He admitted that there was no documentation regarding the loan. Green also acknowledged that the accounting he provided in 2008 or 2009 to the probate court did not mention a loan from him to the trust for $163,000 nor did he ever inform the beneficiaries that he had made the loan.

Green further testified that he used funds from liquidating assets of the trust (the GE and HSBC bonds and $50,000 CD) to pay part of the purchase price of the Loma Property. When asked why those assets did not belong to THFT, Green testified that they were partial reimbursement for the loan he had made to the trust in 2006.

### 3. Post Trial Briefs

The bankruptcy court authorized the parties to file post trial briefs. In his brief, Holt argued that he had traced THFT's funds through the bank statements and Green's testimony to the purchase of the Loma Property. Holt further asserted that Green did not have the right to use the funds, and even if he did have the right at some point, the forfeiture order required him to return any and all assets taken from THFT. Holt asserted that Green's taking of the funds from THFT amounted to

[6] (...continued) response to the second objection. The second objection was not considered by the bankruptcy court during this proceeding and did not go on the court's calendar.

-12-

fraud, conversion, embezzlement and defalcation.

Holt also maintained that Green's allegation of a loan to the trust was unsupported. Holt pointed out that Green made this claim for the first time a decade after he became trustee and that the loan was not listed in either the 2008 List or the 2009 List. Moreover, he never mentioned the loan in the probate court. Holt further asserted that Green had transferred more than the $165,000 from trust funds into Debtors' personal accounts. Thus, even if the loan existed, Debtors took more than they were entitled to receive. Finally, Holt contended that Green was obligated to disclose the existence of the loan in an accounting to the probate court and also would have been required to disclose the existence of the loan in annual accountings to the beneficiaries, but he did not do so.

According to Holt, Debtors should have disclosed the loan as a defense in the Civil Action or disclosed the details of the loan in the probate matter. Since they did not do so, the defense was waived and they were precluded from asserting it in the bankruptcy court.

Finally, Holt noted that Green could not remember where tens of thousands of dollars worth of CDs purchased with trust funds went to, or even how many he had purchased. Accordingly, Holt maintained that Debtors' claim of a loan was simply untenable by operation of law and also implausible under a review of the facts.

In Debtors' post trial brief, they argued that they sold their separate homesteads, loaned part of that money to THFT several years later, and then after they reimbursed themselves,

used the money to purchase the Loma Property. According to Debtors, the "unrebuked evidence" proved these facts and showed that Green paid bills and beneficiaries from the trust account and his own account as permitted by the trust agreement throughout his term as trustee. Debtors further asserted that Holt did not meet his burden of proof on the exemption. Debtors maintained that they "whittled away" at the $360,000 number which Green allegedly transferred from THFT accounts into Debtors' personal accounts through Green's testimony that showed the monies were used for the trust.

Finally, Debtors argued that the facts in Maki were distinguishable. First, Maki involved a default judgment rather than just a default as in this case. Second, there was a lien against the homesteaded property, while here there were no liens ever filed against Debtors' property.

In sum, Debtors argued that neither Holt nor Howard ever proved that THFT's money was used to purchase the Loma Property. Since Green did not obtain the funds to purchase the Loma Property by fraud, as he only reimbursed himself the money he loaned to THFT, Debtors maintained that their home was exempt.

### 4.    The Bankruptcy Court's Ruling

On March 10, 2016, the bankruptcy court issued its findings of fact and conclusions of law sustaining Holt's objection to Debtors' homestead exemption. The bankruptcy court found that based on Green's testimony, he had transferred more than $360,000 from accounts belonging to THFT into Debtors' personal bank accounts. The court also found that Green testified that he was reimbursing himself for undocumented loans which he had

-14-

made to the trust. Finally, the court noted that Green testified that he cashed in or sold outright assets of the trust, including a $50,000 CD and $102,300 in GE and HSBC bonds, for a total of $152,300, and used those funds to pay a portion of the purchase price for the Loma Property.

Based on these facts and the entire record, the bankruptcy court concluded that as a matter of law, under Maki equitable considerations would not permit the homestead exemption to protect Debtors who bought their real property with THFT funds. The court stated that Nevada follows the public policy that an individual using fraudulently obtained funds to purchase real property should not be protected by the homestead exemption because the exemption's purpose was to protect individuals who claimed their homestead in good faith. The court noted that Green acknowledged that at least $152,300 of funds derived from the sale or liquidation of trust assets were used to purchase the Loma Property.

In addition, the bankruptcy court opined that even if Nevada law did not require the denial of Debtors' homestead in its entirety, Nevada law would limit the exemption to the amount of Debtor's equity in the property. Since Green testified that he bought the Loma Property for $230,000 of which $152,300 was derived from the liquidation of trust assets, the trust assets amounted to 66.21 percent of the purchase price. Therefore, according to the court, if Debtors were entitled to claim a homestead exemption, which they were not, the exemption would be limited to $89,525.91.

Next, the court noted that § 522(o) and (p) operated to

-15-

limit the value of Debtors' homestead exemption under specific circumstances. The court found that § 522(o)(4) was not applicable since the statute was limited to scenarios where a debtor disposes of his or her non-exempt assets and then increases the exempt assets with the intent to hinder, delay or defraud a creditor. The court reasoned that since $152,300 of the purchase price for the Loma Property was a trust asset, those funds were never Debtors' non-exempt property and thus § 522(o) was inapplicable.

In applying § 522(p), the court found that the Loma Property was purchased within 1,215 days of the bankruptcy and, therefore, under § 522(p)(1)(D), the homestead exemption would be capped at $155,675. However, the court found that since trust assets were used to purchase the Loma Property, Debtors' homestead exemption would still be limited to $89,523.91 based upon their equity in the property.

On March 14, 2016, the bankruptcy court entered an order consistent with its ruling and disallowed Debtors' homestead exemption in its entirety. Debtors filed a timely appeal from that order.

## II. JURISDICTION

The bankruptcy court had jurisdiction over this proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(B). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUE

Did the bankruptcy court err by disallowing Debtors' homestead exemption in its entirety?

-16-

## IV. STANDARDS OF REVIEW

We review questions regarding a debtor's right to claim an exemption de novo. Kelley v. Locke (In re Kelley), 300 B.R. 11, 16 (9th Cir. BAP 2003).

The bankruptcy court's factual findings, for purposes of determining the validity of a claimed exemption, are reviewed under the clearly erroneous standard. Id. Factual findings are clearly erroneous if they are illogical, implausible or without support in the record. Ret. v. Samson (In re Ret.), 606 F.3d 1189, 1196 (9th Cir. 2010).

"Clearly erroneous review is significantly deferential, requiring that the appellate court accept the [trial] court's findings absent a definite and firm conviction that a mistake has been made." United States v. Syrax, 235 F.3d 422, 427 (9th Cir. 2000). This deference is also given to inferences drawn by the trial court. Beech Aircraft Corp. v. United States, 51 F.3d 834, 838 (9th Cir. 1995). The bankruptcy court's choice among multiple plausible views of the evidence cannot be clear error. See Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

We may affirm the bankruptcy court's orders on any basis supported by the record. See ASARCO, LLC v. Union Pac. R. Co., 765 F.3d 999, 1004 (9th Cir. 2014).

## V. DISCUSSION

**A. Exemptions: Burdens and Standard of Proof**

The bankruptcy code authorizes a debtor to exempt certain

assets. § 522(b). A claimed exemption is "presumptively valid." Carter v. Anderson (In re Carter), 182 F.3d 1027, 1029 n.3 (9th Cir. 1999). Once an exemption has been claimed, the objecting party has the burden of proving that an exemption is not properly claimed. Id. (quoting Rule 4003(c)). The objecting party thus has the initial burden of production and the burden of persuasion. Id. The Ninth Circuit further explained:

> The objecting party must produce evidence to rebut the presumptively valid exemption. If the objecting party can produce evidence to rebut the exemption, the burden of production then shifts to the debtor to come forward with unequivocal evidence to demonstrate that the exemption is proper. The burden of persuasion, however, always remains with the objecting party.

Id.

The standard of proof is by a preponderance of the evidence. See Leavitt v. Alexander (In re Alexander), 472 B.R. 815, 821 (9th Cir. BAP 2012). "The burden of showing something by a 'preponderance of the evidence,' . . . 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for So. Cal., 508 U.S. 602, 622 (1993).

**B. Nevada Homestead Exemption: Legal Standards**

Nevada has opted out of the federal exemption scheme provided under § 522(d). See NRS 21.090(3). Therefore, Nevada law governs substantive issues regarding the allowance or disallowance of Debtors' homestead exemption. See Elliott v.

-18-

*Weil (In re Elliott)*, 523 B.R. 188, 192 (9th Cir. BAP 2014) (bankruptcy court must look to state law and not § 105(a) in determining whether there is a basis to disallow an exemption).

Under Nevada law, exemptions are liberally construed in favor of the debtor. *In re Christensen*, 149 P.3d at 43. Subject to specific exceptions, the Nevada Constitution exempts from a forced sale the homestead that is available to Nevada residents. *See* Nev. Const. art. 4, § 30. NRS 21.090(1)(l) permits Nevada residents to claim the "homestead as provided for by law . . . ." Under NRS 115.020, a homestead is claimed by recording a declaration of homestead at any time before an execution sale of the property. Under NRS 115.010(2), a homestead claimed as exempt from execution "extends only to that amount of equity in the property held by the claimant which does not exceed $550,000 in value . . . ."

While the Nevada homestead exemption is liberally construed in favor of the debtor, protection of the homestead is not absolute. In *Maki*, the Nevada Supreme Court rejected a homestead claim by a judgment debtor who was the sister of a Nevada prison inmate. *Maki*, 75 P.3 at 390. While her brother was in prison, she misappropriated his state insurance disability settlement funds and his monthly disability benefit checks. She used the monies to purchase a residence and then claimed a Nevada homestead exemption after her brother obtained a fraud judgment against her. In holding that the homestead exemption did not apply under the circumstances before it, the *Maki* court observed:

There is a time-honored principle that states that he

-19-

who keeps property that he knows belongs to another must restore that property. This idea, manifested in the doctrine of equitable liens, permeates our entire system of justice regarding equity. '[O]ne who has purchased real property with funds of another, under circumstances which ordinarily would entitle such other person to enforce a constructive trust in, or equitable lien against, the property, cannot defeat the right to enforce such trust or lien on the grounds that [the homestead exemption applies].'

75 P.3d at 378-79. The court went on to say:

'The homestead exemption statute cannot be used as an instrument of fraud and imposition.' Public policy supports our application of an exception to homestead exemptions for victims of fraud or similar tortious conduct. An individual using fraudulently obtained funds to purchase real property should not be protected by the homestead exemption because the exemption's purpose is to provide protection to individuals who file the homestead exemption in good faith. Id.

The Maki court concluded:

Under equitable lien principles, the homestead exemption is inapplicable when the proceeds used to purchase real property can be traced directly to funds obtained through fraud or similar tortious conduct. Id.

In making its decision, the Maki court relied upon Webster v. Rodrick, 394 P.2d 689 (Wash. 1964). In Webster, a married couple claimed a homestead exemption. The wife had embezzled funds from her employer and the funds may have been used to purchase and improve the couple's residence. The employer obtained a judgment against the wife and the marital community based on misappropriation. The employer sufficiently traced the embezzled funds to the residence to support the imposition of an equitable lien against the debtors' residence. The Washington Supreme Court rejected the debtors' claim of a homestead exemption, concluding that the Washington "homestead exemption

-20-

statute cannot be used as an instrument of fraud and imposition." Webster, 394 P.2d at 692.

The holding in Henry v. Rizzolo, 2012 WL 4092604 (D. Nev. 2012) is also persuasive. Rizzolo, a Nevada debtor faced with execution of a judgment, asserted an exemption in certain annuity contracts under NRS 687B.290.1. That statute included a specific exception for "amounts paid for or as premium on any such annuity with intent to defraud creditors . . . ." The federal court interpreting Nevada law concluded that the exception to the annuity contracts exemption required proof of intent to defraud creditors. Id. at *5. A judgment under NRS 112.180(1)(a) had been entered in favor of the executing creditors determining that the same debtor had received a fraudulent transfer of funds owned by her stepson. Applying the statutory exception and "the equitable lien principals set forth in Maki," the court rejected the claimed exemption of the annuity contracts as there was a sufficient basis to conclude that the contracts had been purchased in whole or in part with funds owned and fraudulently transferred by the judgment debtor's stepson. Id. at *8. The court also concluded that dollar for dollar tracing was not required for the entire exemption to be precluded. Id. at *7.

As was the case in Maki and Webster, in Rizzolo the funds used to acquire the property claimed exempt did not belong to the judgment debtor.

**C.  Analysis**

Debtors contend that the bankruptcy court erred in finding that Holt met his burden of proof for disallowance of their

-21-

homestead exemption and argue that the holding in <u>Maki</u> does not apply under these circumstances. We are not persuaded.

The bankruptcy court considered all of the testimony and documentary evidence presented and then chose between two permissible views of the evidence. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." <u>Anderson</u>, 470 U.S. at 574. The record supports the bankruptcy court's implicit finding of fact that it was more likely than not that the monies transferred from THFT accounts into Debtors' personal account were not based on a loan. Green acknowledged that there were no documents regarding the loan, no security interest for the loan, and that he did not provide for a liability to himself on the 2008 or 2009 accounting provided to the probate court. He also testified that he never disclosed the loan to the beneficiaries. Other than his testimony, there was no corroborating evidence that Green actually made any such loan or that it was a valid and existing debt of the trust. As the bankruptcy court found, the loan was "undocumented."[7] Accordingly, based on the evidence before it, the bankruptcy court could reasonably infer

---

[7] In federal tax cases, courts consider a number of factors to determine whether a particular payment must be characterized as a loan, although no one factor is controlling. While this is not a federal tax case, the factors are relevant. They include: (1) the existence of a note or other evidence of indebtedness, (2) whether the prepaid loan amount is determinable, (3) whether a definite time for repayment exists, (4) whether interest is paid on the "indebtedness," (5) whether there is a provision for security, (6) the borrower's ability to repay, and (7) how the parties treat the transaction. <u>See</u> <u>United States v. Williams</u>, 395 F.2d 508 (5th Cir. 1968); <u>Kohler-Campbell Corp. v. United States</u>, 298 F.2d 911 (4th Cir. 1962).

there was no loan.

Furthermore, while Green testified that the trust agreement gave him almost unlimited discretion, including transferring money into Debtors' personal account, his testimony also showed that he could not remember or fully explain what happened to certain trust funds. Green admitted that he mistakenly paid some personal expenses with trust funds and that he could not account for over $29,000 which was received for the sale of trust property. Finally, nowhere in the record is there a full accounting of trust assets or liabilities.

Without evidence of a loan or an accounting, the bankruptcy court could reasonably infer that there was no legitimate reason for transferring THFT's funds into Debtors' personal account. Because Green admitted that he used funds from THFT's account to purchase the Loma Property, the bankruptcy court properly applied the holding in Maki. Debtors' attempt to distinguish Maki on the basis that Holt did not obtain a default judgment against them or obtain an equitable lien against the Loma Property is unavailing. Maki simply applied equitable lien principles to disallow the homestead exemption. There is nothing in Maki that requires a judgment. Maki essentially concludes that the Nevada legislature never contemplated or intended that a homestead interest could be created or maintained with wrongfully appropriated property.

Finally, the bankruptcy court issued an alternative ruling allowing Debtors' homestead exemption to the extent Holt did not trace THFT's funds dollar for dollar into the Loma Property. While Holt had the initial burden of tracing THFT's funds into

-23-

Debtors' homestead, "[t]he burden of tracing does not require 'dollar-for-dollar accounting' . . . ., and the party seeking recovery may meet this burden by identifying the relevant pathways." Rizzolo, 2012 WL 4092604, at *7. Without an accounting of trust assets and liabilities, the commingling of THFT's funds with Debtors' personal funds made it impossible to sort out on a dollar-for-dollar basis which funds were used to purchase the Loma Property. The fact that Debtors cannot account for over $300,000 of THFT's funds supports the conclusion that the homestead was purchased with its funds. Id. In sum, the bankruptcy court's disallowance of Debtors' homestead exemption in its entirety was proper.[8]

## VI.  CONCLUSION

For the reasons stated, we AFFIRM.

---

[8] Neither § 522(o) nor (p) applies under these circumstances.

-24-