ELIZABETH JEAN STARR, Appellant, v. CHARLES ROUSSELET, Special Administrator of the Estate of LAURENCE ROUSSELET, Respondent.

No. 21603

July 7, 1994            877 P.2d 525

*David C. McElhinney,* Reno, for Appellant.

*Fred Hill Atcheson* and *Lawrence Wishart,* Reno, for Respondent.

# OPINION

By the Court, STEFFEN, J.:

Appellant, Elizabeth Jean Starr, challenges on appeal the district court's order determining that funds held jointly by Starr and Laurence Rousselet ("Rousselet" or "the decedent") in a checking account belonged to Rousselet's estate upon his death. Concluding that the district court's ruling was correct, we affirm.

## FACTS

Rousselet, a widower with three adult children, died on January 14, 1990. His wife had preceded him in death over five years earlier. After the death of his wife, Rousselet continued to have contact and a fatherly relationship with his married daughter, Diane Gawart, and his son Charles, who lived in Reno and who would frequently prepare meals for his father. Sometime shortly before his death, Rousselet had also been in contact with his son Lawrence, who lived in Napa, California, regarding the possibility of the father moving to a veterans' home in that area where the climate was more to his liking. Other evidence of record revealed that Rousselet maintained a valued relationship and contact with his children, grandchildren, siblings and friends up until the time of his death.

During the year of his wife's death, in 1984, the lonely widower developed a nonromantic friendship with Starr, whom he had met while playing keno in a Reno casino. In 1987, Rousselet and Starr decided to live together and thereby lessen their rental expenses. The evidence revealed that the relationship between the two was of a platonic nature, and that they maintained separate bedrooms in each house or apartment where they resided. During this period, Rousselet dated various women; indeed, Starr admitted that the relationship she had with Rousselet was not an intimate one.

On December 14, 1989, Rousselet was hospitalized. Six days later, Valley Bank processed a signature card that added Starr's name to Rousselet's checking account, thereby effectuating a change in the account from that of an individual to a joint account. At the time, there was a balance in the account of over $60,000.00. A Valley Bank official testified that under the joint account, both Rousselet and Starr had access to the funds in the account.

There was testimony adduced at the hearing indicating that Starr's name had been added to the account for convenience, thus

enabling her to write checks for joint expenses. Starr testified that Rousselet said that she "might have to write a check" and admitted that Rousselet had never given her any money out of the Valley Bank account and that she had never written a check on that account while Rousselet was alive.

The following additional facts presented at the hearing undoubtedly had more than a little to do with the district court's conclusion that much of Starr's testimony was not credible. Rousselet was released from the hospital for a short period of time prior to his death. While in the hospital, Rousselet was found at one point wandering in the halls in a disoriented state. His daughter, Diane, who was a certified nurse's aide, travelled from her home in Wyoming to care for her father for a period of time after his release from the hospital.

Diane testified that after she arrived, her father retrieved two $100 bills from an old bank pouch in order to help defray her travel expenses. Testimony of an old and close family friend and members of the family revealed that Rousselet had kept large amounts of cash in his wallet, in a coffee can in his apartment, and in the bank pouch.

Rousselet was admitted to a Reno veterans' nursing home several days before his demise on Sunday, January 14, 1990. The following day was a banking holiday. On Tuesday, Starr went to Valley Bank, closed the joint account and transferred the funds to an individual account in her name. Starr testified that Rousselet did not want his children to receive anything, and that in fact he said, "I want them to pay for my funeral."

For a brief time after Rousselet's wife died, there was some tension between Rousselet and his daughter Diane and son Lawrence because Rousselet had ordered his wife's body cremated, a decision the children found objectionable for religious reasons. However, the testimony of friends indicated that they were unaware of Rousselet ever speaking ill of his children or stating that he intended to leave the bulk of his assets to Starr. Rousselet and his one son formerly owned service stations together in Florida and California, and near the end of his life, Rousselet offered to give Diane a $6,000.00 down payment on a house as she had indicated a willingness to move to Reno permanently to care for her father.

On January 18, 1991, the three grown children went to their father's apartment to collect his possessions. Four officers from the Reno Police Department accompanied them in order to maintain order. Although the children had keys to Rousselet's apartment, the locks had been changed after his death. Unable to locate many of Rousselet's effects, Starr was asked if she knew where the decedent's checkbooks, bank book, and coin collection

were located. She responded in the negative and announced that she had to leave for a hairdresser's appointment. The police then asked Starr to show them the title to the automobile. As Starr sought to retrieve the title from the trunk of the vehicle, the police noticed a large stack of silver dollars in the right corner behind the hatchback. When one of the officers asked Starr about the coins, she replied that her mother had given them to her.

Noticing that the car contained a large number of documents bearing Rousselet's name, the police again asked Starr about the ownership of the coins. She then admitted that the coins belonged to the decedent, but claimed that Rousselet had said that he did not want his kids to use or sell them. Further scrutiny of the contents of the car revealed a bag of torn and shredded documents that proved to be what was left of Rousselet's checks and deposit slips. Starr testified that Rousselet had told her to destroy these old documents after she opened the new account. The police thereafter searched Starr's room, where they found some of Rousselet's silver spoons. Diane later discovered the empty bank pouch in Starr's room. Starr denied having seen the pouch before and testified that she was not aware that Rousselet kept large amounts of money in his wallet or in a coffee can in the apartment.

The bank book was later discovered under Starr's mattress, but none of the cash that Rousselet allegedly kept in large amounts in his apartment was ever recovered. As noted previously, Starr never contributed to the joint account and never wrote a check on that account while Rousselet was alive. A few years prior to his death, Rousselet had withdrawn funds to purchase a Hyundai automobile which was registered solely in Starr's name. Starr testified that Rousselet had bought her a brand new car and told her that anytime, if she wanted to "give him money for it fine, it was up to me." Later, Starr identified an account book kept by Rousselet which she said also corresponded to her own record, which showed the $6,000.00 balance she "owed to Larry [Rousselet] for the car."

Although there was conflicting testimony provided at the hearing, the district court judge concluded that if she were to rule according to the facts rather than the law, she would have found "no credible evidence that the decedent intended to create a joint-tenancy account with the Respondent [Starr]." Continuing, the district judge found that the "weight of the evidence supports the conclusion that the decedent's only purpose in adding the Respondent's [Starr's] name to the account was to insure that by her access to the account during his period of hospitalization, his bills would not go unpaid." The judge also stated that she "found most, if not all, of Respondent's [Starr's] testimony to the con-

trary to be incredible." Citing McKissick v. McKissick, 93 Nev. 139, 147, 560 P.2d 1336, 1370-71 (1977), the district judge nevertheless concluded that despite her view of the evidence, her decision would necessarily be dictated by the law, rather than oral evidence concerning the intent of the parties.

On January 17, 1990, the district court appointed Rousselet's son, Charles, as Special Administrator of his father's estate. The court also issued a restraining order preventing withdrawal by Starr of any of the funds which she had transferred from the joint account to an individual account in her name at Valley Bank. The funds in the Valley Bank account represented the major asset of Rousselet's estate.

Starr sought to quash the restraining order on grounds that the money in the account was her property. After a two-day hearing, the district court entered its decision, holding that the funds in the contested account were the property of the decedent's estate. Starr appeals.

## DISCUSSION

The single issue for this court to decide is whether the joint account created by a new bank signature card bearing the signatures of both Rousselet and Starr gave rise to an account held in joint tenancy with rights of survivorship.

As previously indicated, approximately three weeks prior to his death, and while hospitalized, Rousselet signed a new bank signature card which, with the addition of Starr's signature, would give Starr joint access to the funds in the account. Starr took the new card to Valley Bank and effectuated the conversion from an individual to a joint account. The nature of the account was identified by an "X" placed in the box next to the word "joint," thus designating a joint account. In addition, the signature card specified (with respect to any of six different types of accounts that the card was designed to accommodate): "The undersigned authorize Valley Bank of Nevada to recognize any of the signatures inscribed below in payment of funds or transactions of any business for this account." There were no other provisions on the card relevant to the issue before us.

In the McKissick case, we rejected dictum in an earlier case (Edmunds v. Perry, 62 Nev. 41, 140 P.2d 566 (1943)) which suggested that oral evidence could be admitted to remedy any deficiency in a written instrument purporting to establish ownership in joint tenancy. In addition, we stated:

> Since joint tenancy is a method by which property may pass upon death a written instrument specifying such intention is essential. Creditors of the decedent and the rights of others who normally would be the natural objects of his

bounty may be involved. Their claims should not be erased by oral testimony of intention given by one asserting the rights of a surviving joint tenant. Only a writing may accomplish that consequence. Indeed, joint tenancies are not favored in courts of equity. Newitt v. Dawe, 61 Nev. 472, 133 P.2d 918 (1943).

*Id.* at 147, 560 P.2d at 1370-71.

*McKissick* also cited NRS 111.065(2)[1] in support of the court's conclusion that a writing is required in order to create a joint tenancy. *Id.* at 146, 560 P.2d at 1370. Although it is clear from our ruling in *McKissick* that parol evidence is not admissible to prove the existence of a joint tenancy, it does not follow that parol evidence is inadmissible to disprove questionable evidence of joint tenancy. In those instances where an instrument falls short of unambiguous evidence of joint tenancy, the policy declared in *McKissick* would be served by admitting parol evidence to prove that a joint tenancy ownership was never intended by the parties.

Nevada statutory law respecting joint tenancies in the form of bank accounts must be considered in resolving the issue presented by the instant case. NRS 100.085 provides, in pertinent part:

1. When a deposit has been made in the name of the depositor and one or more other persons, and in form to be paid or delivered to any one of them, or the survivor or survivors of them, the deposit is the property of the persons as joint tenants. The money or property shall be held for the exclusive use of the persons named, and may be paid or delivered to any of them during the lifetime of all, or to the survivor or survivors after the death of the depositor, and payment or delivery is a valid and sufficient release and discharge of the depository.

2. The making of a deposit in the form of a joint tenancy vests title to the deposit in the survivor or survivors.

NRS 100.085 was adopted in 1977 as an amendment to NRS 663.015, which was repealed.[2] Prior to its repeal, NRS 663.015[3]

---

[1] NRS 111.065(2) provides: "A joint tenancy in personal property may be created by a written transfer, agreement or instrument."

[2] *See* 1977 Nev. Stat. ch. 422, § 3 at 806.

[3] NRS 663.015 provided:

Deposits in names of two or more persons:

1. When a deposit has been made, or is made after July 1, 1971, by any person, in any bank or other depository transacting business in this state, in the name of such depositor and one, two or more persons, and in form to be paid to the survivor or survivors of them, such deposit and any addition thereto made by any of such persons, after the making thereof, shall become the property of such persons as joint tenants, and

was interpreted by this court as providing a conclusive presumption of joint tenancy. *See* Weinstein v. Sodaro, 91 Nev. 638, 541 P.2d 531 (1975). *Weinstein,* because of the amendment and repeal of NRS 663.015, has no application to the instant case.

NRS 100.085, the successor statute to NRS 663.015, does not contain the language of the latter statute which, when the terms of the statute were satisfied, made joint tenancy a *conclusive* presumption. We note, however, that the repealed statute based the conclusive evidence of joint tenancy upon a deposit that was made in the name of the depositor and one or more persons "in form to be paid to the survivor or survivors of them."

Under the current statute, NRS 100.085, survivorship language was retained and the element of joint access or joint control of the account was added. The district court discerned ambiguity in the statute, but concluded that the most reasonable interpretation of its terms required joint tenancy instruments covered by the statute to include expressions of both joint control and rights of survivorship.

Neither the terms of the statute nor its legislative history, singularly or in combination, clearly reveal whether the inclusion of survivorship terminology on a bank signature card is necessary to the creation of ownership in joint tenancy. We agree, however, that the interpretation reached by the district court is preferable to alternative views, and is more consistent with traditional notions pertaining to the establishment of joint tenancy accounts. As the district court observed, survivorship is the hallmark of joint tenancy.

As reaffirmed in *McKissick,* joint tenancies are not favored in courts of equity. We therefore conclude, in the interest of certainty, that in the absence of survivorship language, a simple reference to a "joint" account and to joint access or control on a bank signature card will not suffice for purposes of establishing a joint tenancy under NRS 100.085.[4] Nor may the deficiency be

---

such deposits, together with all dividends thereon, shall be held for the exclusive use of such persons and may be paid to any of them during the lifetime of all or to the survivor or survivors after the death of any of them. Such payments and receipts or acquittance of the person or persons to whom such payment is made shall be a valid and sufficient release and discharge to such bank or other depository for all payments made on account of such deposit.

2. The making of the deposit in such form shall, in the absence of fraud or undue influence, be *conclusive* evidence, in any action or proceeding to which either such bank or other depository, or a surviving depositor, is a party, of the intention of the depositors to vest such deposit and the additions thereto in such survivor or survivors.

[4]The district court judge noted the difference between NRS 100.085 and NRS 678.600; the latter statute refers to multi-party credit union accounts

remedied by parol evidence. *See McKissick,* 93 Nev. at 147, 560 P.2d at 1370. The district court did not err in finding the bank signature card inadequate to establish a joint tenancy.

## CONCLUSION

For the reasons discussed above, the judgment of the district court is affirmed.

SPRINGER and SHEARING, JJ., concur.

YOUNG, J., with whom ROSE, C. J., joins, dissenting:

I respectfully dissent from the majority's opinion. I disagree both with the majority's interpretation of NRS 100.085 and with what appears to be a new and inequitable parol evidence rule as to joint tenancies.

The majority concludes that the most reasonable interpretation of NRS 100.085 is that a joint tenancy does not exist absent right of survivorship language. I disagree. In my opinion, the wording of the statute does not require such language.

The predecessor to NRS 100.085 was NRS 663.015. The earlier statute required that in order to create a joint tenancy with a right of survivorship, a deposit had to be made in the name of the depositor and one or more others *"and* in form to be paid to the survivor or survivors of them . . . ." (Emphasis added.) However, our current statute, NRS 100.085 requires a deposit be made in the name of the depositor and one or more other persons, "and in form to be paid or delivered to any of them, *or* the survivor or survivors of them . . . ." (Emphasis added.) If such is the case, "the deposit is the property of the persons as *joint tenants."* (Emphasis added.) The clear meaning of this statute, as opposed to its predecessor, is that no "magic words" are necessary to create a joint tenancy with a right of survivorship in a joint bank account.

In the instant case, the bank signature card stated that the

---

and was also an amendment contained in Senate Bill 74. NRS 678.600 provides, in pertinent part:

> 1. A multiple-party account payable to two or more persons, jointly or severally, *which does not expressly provide that there is not a right of survivorship, though there is no mention of survivorship or joint tenancy, is a survivorship account.* The right of survivorship continues between survivors.

(Emphasis supplied.) The absence of the highlighted provision of NRS 678.600 within the provisions of NRS 100.085, despite being part of the same senate bill, strongly suggests that the omission was purposeful.

The statutes pertaining to bank accounts and credit union accounts differ because deposits to the latter are frequently treated as shares, and at least one party to a multiple-party credit union account must be a member of the credit union. *See* NRS 678.160(2) and NRS 678.020.

account was "joint." In addition, above the signature lines, it stated that "[t]he undersigned authorize Valley Bank of Nevada to recognize any of the signatures inscribed below in payment of funds or transactions of any business for this account." Accordingly, I must conclude that this account complied with the dictates of NRS 100.085, thus making Starr and Rousselet joint tenants. The majority's decision calls into question the validity of the expectations of all those holding joint bank accounts in this state. Must banks now question all those whose names are on joint accounts prior to allowing any withdrawal? Must all accounts include the words "with a right of survivorship" in order to create a true joint tenancy? I fear that is the case in light of the majority's holding. Indeed, if all "joint accounts" as existed in this case are not "joint," are the holders then tenants in common? If so, then it appears Ms. Starr must have a right to half the proceeds of this account as a surviving tenant in common. The majority makes no mention of the propriety of her removing the funds from the account, only the propriety of her possession of those funds. Is a new form of ownership being created, that of a joint tenant who may remove funds, but may not keep them? While the majority may feel that its conclusion is "consistent with traditional notions pertaining to the establishment of joint tenancy accounts," it is certainly not consistent with the clear wording of NRS 100.085.

In addition to the majority's interpretation of NRS 100.085, I also disagree with the majority's dictates concerning parol evidence in joint tenancy disputes. The majority correctly notes that in accordance with our holding in McKissick v. McKissick, 93 Nev. 139, 560 P.2d 1336 (1977), parol evidence is not admissible to prove the existence of a joint tenancy. However, the majority also goes on to hold that parol evidence *is* admissible to disprove questionable evidence of a joint tenancy.

I agree that parol evidence should not be allowed to prove the existence of a joint tenancy. However, my question as to the majority's holding is whether after a court allows parol evidence to disprove a joint tenancy, may the alleged joint tenant then present evidence to refute the admitted parol evidence? It appears manifestly unfair to allow one side to present parol evidence and then not allow the other side to refute that evidence. And yet, that would be the result of the majority's holding.

In addition, I question the majority's ruling that parol evidence is admissible to "disprove *questionable* evidence of joint tenancy." (Emphasis added.) Does this refer only to questionable written evidence? Further, what is the criteria for determining whether evidence is "questionable" and thus refutable by parol

evidence? I fear the majority's decision serves only to further complicate an already complicated process.

A far more equitable standard would be to continue to prohibit parol evidence to prove the existence of a joint tenancy. However, when faced with parol evidence disproving a joint tenancy, the alleged joint tenant should be allowed to refute that evidence with parol evidence. I agree with the majority that courts of equity do not favor joint tenancies. However, I do not believe it is our job to actively discourage joint tenancies as the majority appears to be doing today. Accordingly, I respectfully dissent.