134 Nev., Advance Opinion 103

# IN THE COURT OF APPEALS OF THE STATE OF NEVADA

HELEN NATKO,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 73048-COA

**FILED**

DEC 20 2018

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of exploitation of a vulnerable person and theft. Eighth Judicial District Court, Clark County; William D. Kephart, Judge.

*Reversed and remanded.*

Foley & Oakes, PC, and Daniel T. Foley, Las Vegas,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, Jay P. Raman, Chief Deputy District Attorney, and Charles Thoman, Deputy District Attorney, Clark County,
for Respondent.

BEFORE SILVER, C.J., TAO and GIBBONS, JJ.

*OPINION*

By the Court, SILVER, C.J.:

In this appeal, we consider whether the district court erred by instructing a jury, in a criminal case for exploitation of a vulnerable person and theft, that "[a] person's status as a joint account holder does not by itself provide lawful authority to use or transfer another['s] assets for their own benefit." We conclude this instruction is inconsistent with NRS 100.085,

18-909620

and it does not accurately and completely reflect the reasoning and conclusion in *Walch v. State*, 112 Nev. 25, 909 P.2d 1184 (1996). Accordingly, we hold the jury instruction was a misstatement of law, and it was error to give the instruction. Because the State has failed to demonstrate the error was harmless, we reverse.

## FACTS AND PROCEDURAL HISTORY

Helen Natko and Delford Mencarelli began dating in 1982, a year or two after their respective spouses passed away. During a visit to Pennsylvania in May 2012, Mencarelli was hospitalized for low blood sugar, a complication of his diabetes. After the couple returned to their shared home in Las Vegas, Natko and Mencarelli gave each other durable power of attorney, purportedly so that Natko could help care for Mencarelli. Four days later, Mencarelli added Natko as a joint account holder on his Las Vegas credit union account. In July 2013, Natko withdrew $195,000 from the couple's joint bank account and temporarily placed it into her personal bank account. She returned the money to the couple's joint account within the month. Mencarelli died approximately two years later.

Nine months after Mencarelli's death, the State charged Natko with exploitation of a vulnerable person and theft based on the act of withdrawing the money from the joint account in 2013.[1] At trial, the State

---

[1]The dissent speculates that Mencarelli "may" have lacked mental capacity at the time the joint bank account was created a year prior, thus voiding the joint account and removing any legal claim Natko may have had to the funds within the account. This is mere speculation, and no evidence exists of this in our record. Tellingly, the State's information charged Natko with "willfully, unlawfully and feloniously" exploiting a vulnerable person and theft on *July 5, 2013*, by withdrawing the $195,000 from a bank account on which she was listed as a joint tenant. The withdrawal of money occurred a full year *after* the date from which she and Mencarelli set up the

proposed jury instruction 18, which stated: "A person's status as a joint account holder does not by itself provide lawful authority to use or transfer another['s] assets for their own benefit." This language was taken nearly verbatim from *Walch*. Natko objected to the instruction, arguing it was inaccurate under the current version of NRS 100.085, which was amended in 1995. The district court, relying on *Walch*, ultimately gave the instruction. A jury found Natko guilty on both counts,[2] and the district court sentenced her to a suspended aggregate prison term of 36 to 144 months and placed her on probation. This appeal follows.

## ANALYSIS

Natko argues that jury instruction 18 was a misstatement of law because it directly contradicts NRS 100.085, and the district court incorrectly relied on *Walch* in giving the instruction because *Walch* was decided under a prior version of NRS 100.085. The State counters that jury instruction 18 was a correct statement of law that was not overruled by the amendments to NRS 100.085 and, therefore, the district court properly relied on *Walch*.

"District courts have broad discretion to settle jury instructions." *Cortinas v. State*, 124 Nev. 1013, 1019, 195 P.3d 315, 319 (2008). "While we normally review the decision to [give or] refuse a jury instruction for an abuse of that discretion or judicial error, we review de novo whether a particular instruction, such as the one at issue in this case,

---

joint bank account. Significantly, too, the State *never* charged Natko with exploitation or fraud for any actions prior to the date of the withdrawal of funds from the joint bank account.

[2]The judgment of conviction erroneously states Natko was convicted pursuant to a guilty plea.

comprises a correct statement of the law." *Id.* Further, whether jury instruction 18 was an accurate statement of the law involves statutory interpretation, which we also review de novo. *See Bigpond v. State*, 128 Nev. 108, 114, 270 P.3d 1244, 1248 (2012). When interpreting a statute, we first examine the statute's plain meaning. *Id.* "[I]f the statute is clear, we do not look beyond the statute's plain language." *Sheriff v. Witzenburg*, 122 Nev. 1056, 1061, 145 P.3d 1002, 1005 (2006).

NRS 100.085 was amended to its current version in 1995.[3] 1995 Nev. Stat., ch. 426, § 1, at 1054-55. NRS 100.085(1) provides, in relevant part: "If an account is intended to be held in joint tenancy, the account or proceeds from the account are *owned* by the persons named, and may be paid or delivered to any of them . . . ." (Emphasis added.) And, as relevant to this appeal, NRS 100.085(4) provides that, "[f]or the purposes of this section, unless a depositor specifically provides otherwise, the use by the depositor of [joint account] . . . in designating the ownership of an account indicates the intent of the depositor that the account be held in joint tenancy." When read together, the plain language of NRS 100.085(1) and (4) establishes a presumption that a person's status as a joint account holder

---

[3]We recognize that the opinion in *Walch* was issued in 1996. However, *Walch* is not controlling here, because the defendant, Walch, was charged based on acts that were committed before the amendment of NRS 100.085, and therefore, the *Walch* court would have considered the pre-amendment version of NRS 100.085 when deciding the appeal. *See State v. Second Judicial Dist. Court (Pullin)*, 124 Nev. 564, 568, 188 P.3d 1079, 1081 (2008) (stating, in the context of addressing sentencing penalties, "the law in effect at the time of the commission of a crime governs the prosecution of criminal offenses").

provides that person with ownership of, and authority to use, the funds in the joint account.[4]

In contrast to NRS 100.085, jury instruction 18 stated that a person's status as a joint account holder alone does not provide the authority to use another person's assets. Jury instruction 18 was inconsistent with NRS 100.085 because it implied Natko did not have lawful authority to use or transfer the funds in the joint account for her own benefit. The State argues that the instruction was nevertheless a correct statement of the law under *Walch*. We disagree.

In *Walch*, the elderly victim gave the defendant, Walch, durable power of attorney that "expressly precluded Walch from using [the victim's] assets for Walch's own legal obligations, including but not limited to support of the agent's dependents." 112 Nev. at 27, 909 P.2d at 1185 (internal quotation marks omitted). Walch thereafter opened two joint bank accounts with the victim's money that named Walch and the victim as joint account holders, and Walch wrote checks from those accounts for her personal use.

---

[4]Because the statute is clear, we need not look to the legislative history to determine the meaning of the statute. *See Witzenburg*, 122 Nev. at 1061, 145 P.3d at 1005. Nevertheless, we note that the legislative history expressly demonstrates that the 1995 amendments to NRS 100.085 were specifically intended to clarify that each party on a joint account has a right to funds in the account and the right of survivorship to funds in the account upon the death of one of the account holders. *See* Hearing on S.B. 424 Before the Assembly Judiciary Comm., 68th Leg. (Nev., June 15, 1995) (John Sande, representing the Nevada Bankers Association, testified that "if it is held as a joint tenancy, as that is defined in [NRS 100.085] under Subsection 4 . . . either party, or any party that [is] on the account, has the right to those funds, that they will pass to the survivor on the death so that there's certainty," and, upon inquiry, he clarified that "[u]nder any interpretation," any party on a joint account, even if the parties do not live in the same house and have different families, "could take all the funds out of that account.").

*Id.* at 27-29, 909 P.2d at 1185-86. On appeal, Walch cited to NRS 100.085(1) and argued that she could not be guilty of theft as a matter of law because, as a party on the joint accounts, she had lawful authority to withdraw any or all of the funds from those accounts and use them as she wished. *Id.* at 30-31, 909 P.2d at 1187-88. The supreme court rejected this argument, concluding that "Walch's mere status as a party to the joint accounts did not provide her with lawful authority to use [the victim's] assets for her own benefit and therefore did not preclude her conviction for theft." *Id.* at 33, 909 P.2d at 1189. This conclusion was based on the observation that the jury "could have concluded that Walch placed [the victim's] funds into the two accounts with the intention of withdrawing them later for her own benefit." *Id.* The court reasoned that "[i]f so, Walch's felonious intent and actions commenced before such monies reached the two accounts, and her status as a joint legal owner of the account funds would not shield her from culpability for theft of funds subsequently withdrawn and misused." *Id.*

In *Walch*, therefore, the supreme court did not conclude that NRS 100.085 does not create a presumption of ownership by a joint account holder of the funds in a joint account. Rather, *Walch* is best understood to stand for the proposition that despite the presumption of ownership established by NRS 100.085, a person named on a joint account can still be, under some circumstances, convicted of theft for withdrawing and/or misusing funds from the joint account. The State is correct that this aspect of *Walch* was not impacted by the 1995 amendments to NRS 100.085. This is so because there is nothing in NRS 100.085 that precludes a joint account holder from being convicted of theft for the withdrawal and/or misuse of funds in the joint account. However, based on the reasoning in *Walch*, in order to convict a joint account holder of theft based on the withdrawal

and/or misuse of funds from a joint account, the State must allege and establish that the criminal intent arose prior to the funds being deposited into the joint account.

Because jury instruction 18 broadly stated: "A person's status as a joint account holder does not by itself provide lawful authority to use or transfer another['s] assets for their own benefit," it did not accurately reflect the reasoning and conclusions in *Walch* and was therefore incomplete. Notably, the instruction did not identify the circumstances under which a person named as a party on a joint account could be convicted of theft based on withdrawal and/or misuse of funds from the joint account.[5] Accordingly, we conclude jury instruction 18 was not a correct statement of the law and it was error to give the instruction.

Because Natko objected to the use of jury instruction 18, we review the error under the harmless error standard. *See Barnier v. State*, 119 Nev. 129, 132, 67 P.3d 320, 322 (2003). "[T]he State bears the burden of proving that the error was harmless." *Polk v. State*, 126 Nev. 180, 183 n.2, 233 P.3d 357, 359 n.2 (2010).[6] To meet this burden, it may be necessary

---

[5]A jury instruction that accurately reflects the reasoning and conclusions in *Walch* may have stated the following: A person's status as a joint legal owner of account funds does not shield the person from culpability for the taking of those funds if the State can demonstrate that the person's criminal intent and actions commenced before the money was placed into the joint account.

[6]The dissent argues that the lack of trial transcripts in the record demands an affirmance. However, because the State failed to argue harmless error after Natko alleged reversible error by the district court, the State waived its argument that harmless error applies. *Polk*, 126 Nev. at 183 n.2, 233 P.3d at 359 n.2 ("[A respondent] who fails to include and properly argue a contention in the [respondent's] brief takes the risk that the court will view the contention as forfeited." (internal quotations and

for the State to file a respondent's appendix that includes "those documents necessary to rebut appellant's position on appeal which are not already included in appellant's appendix." NRAP 30(b)(4). Reversal will be warranted unless the State can show "it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Nay v. State*, 123 Nev. 326, 334, 167 P.3d 430, 435 (2007) (internal quotation marks omitted).

The State fails to argue on appeal, let alone demonstrate from the record, that the error is harmless. A joint appendix was not filed in this appeal and, although recognizing Natko did not provide this court with a copy of the trial transcripts, the State did not file a respondent's appendix and provide the trial transcripts to this court. Nothing in the record before this court indicates that Mencarelli or Natko specifically provided that they did not intend to hold the joint account in joint tenancy. Therefore, jury instruction 18 was not a correct statement of the law, and it improperly implied to the jury that Natko did not have lawful authority to use and/or withdraw the funds in the joint account. The State alleged Natko committed the crimes of exploitation of a vulnerable person and theft based on the act of withdrawing money from Natko and Mencarelli's joint account. Thus, without the trial transcripts, or anything to show the facts are like those in *Walch*, we cannot say that the error was harmless. Because the State has failed to meet its burden and demonstrate the error is harmless, we conclude the error warrants reversal.

---

citation omitted)). And, because the jury instruction given here was incomplete, as a matter of law, we are constrained to reverse under the circumstances of this case. *See Cortinas*, 124 Nev. at 1019, 1023-27, 195 P.3d at 319, 322-24 (reviewing de novo whether a jury instruction is a correct statement of law and addressing the effect of instructional errors).

*CONCLUSION*

The district court erred by giving jury instruction 18 because it was not a correct statement of the law. The instruction was inconsistent with NRS 100.085 because it broadly stated that a person's status as a joint account holder did not give her the authority to use another's assets within the joint account for her own benefit. Further, the instruction did not accurately reflect the reasoning and conclusions in *Walch*. Because the State has failed to meet its burden to demonstrate this error was harmless, we reverse and remand for further proceedings consistent with this opinion.

_____, C.J.
Silver

I concur:

_____, J.
Gibbons

TAO, J., dissenting:

Before we can even get to the merits of Natko's arguments, there's a threshold problem: Natko was convicted following a jury trial, yet failed to supply copies of the trial transcript for us to review on appeal. We have partial transcripts of arguments of counsel surrounding the challenged jury instruction and some transcripts of post-trial motion argument. But we have no transcripts of the testimony of any trial witness reflecting the evidence admitted during the trial, no transcripts of the opening statements, and no transcripts of the closing arguments.

Consequently, we have no idea—none at all—what transpired at trial, what evidence either party introduced, or what the jury's verdict was or was not based upon. Absent that, I don't know how we can possibly analyze what effect, if any at all, jury instruction 18 may have had upon Natko's trial. To me, that omission alone demands affirmance, because we're required to presume that any missing portions of the record support, not undermine, the jury's verdict. *See Johnson v. State*, 113 Nev. 772, 776, 942 P.2d 167, 170 (1997) ("It is appellant's responsibility to make an adequate appellate record. We cannot properly consider matters not appearing in that record." (citation omitted)); *Riggins v. State*, 107 Nev. 178 182, 808 P.2d 535, 538 (1991) (concluding that if materials are not included in the record on appeal, the missing materials "are presumed to support the district court's decision"), *rev'd on other grounds by Riggins v. Nevada*, 504 U.S. 127 (1992).

At the very least, I don't know what business we have reversing a felony jury verdict when the appellant has failed to properly apprise us of what actually happened below. Yet not only does the majority reverse a felony conviction without a transcript of the proceedings below, it does so

via a broad legal ruling that upends a large swath of settled law. If the majority is correct, then NRS 100.085 isn't an obscure and rarely litigated statute unknown to much of the public, but rather one of the most sweeping laws ever enacted in Nevada—one that fundamentally undermines property law all the way back to the founding of this State.

Where I think the majority errs is in conflating the concept of legal authority (or possession) over personal property with the concept of ownership (or title) of the property. NRS 100.085 deals with the authority of any named account holder to withdraw money from a joint account and the bank's liability for allowing such withdrawals. But the majority makes it reach much farther to say that the act of depositing money into a joint account actually changes who owns the money. I read NRS 100.085 as saying nothing of the sort, and for all of these reasons I respectfully dissent.

## I.

This appeal arises from a criminal case that implicates defenses based upon principles of banking and property law. On appeal, Natko raises a single argument: she asserts that one jury instruction given at trial (jury instruction 18) was incorrect.

Natko was convicted of two felony counts: one count of theft and one count of exploitation of a vulnerable person. The crux of the charges (as far as we can tell based upon arguments of counsel without a transcript of the trial) was that her name was added to a bank account first opened by her victim (her long-time boyfriend, according to the briefs), which changed it from a sole account to a joint one, and thereafter she withdrew large amounts of money from it at a time when the victim might not have been sufficiently lucid to agree to such financial decisions.

Her defense was this (again, based upon arguments of counsel without an actual trial transcript): once the account became a joint account, all of the money in it became hers as a "joint tenant" to use any way she pleased, and she could not possibly be convicted of stealing what already belonged to her. At common law, joint tenants could not "steal" jointly owned property from each other. *See* 3 Wayne LaFave, *Substantive Criminal Law* § 19.4(c), at 106 (3d ed. 2018) ("The common law view of larceny is that [one joint tenant] cannot steal from the other co-owner."); 3 Charles E. Torcia, *Wharton's Criminal Law* § 381, at 457-58 (15th ed. 1995) ("When, under principles of property law, property is owned by cotenants so that each one is entitled to the possession of the property jointly or in common with the others, one tenant cannot be guilty of larceny when he takes possession of the property, even though he does so with the intent to exclude the others from its use and enjoyment . . . .").

The question is whether a "joint tenancy" existed here. For support, Natko contends that NRS 100.085 mandates that all money deposited in joint accounts, automatically and by operation of law, becomes the property of all account holders in joint tenancy. Consequently, she asserts the following jury instruction incorrectly describes the law:

> 18. A person's status as a joint account holder does not by itself provide lawful authority to use or transfer another [sic] assets for their own benefit.

But it seems to me to be Natko, not jury instruction 18, who misstates the law. Natko confuses the act of placing a name onto a bank account with legal ownership of the assets within the account. The creation of a bank account is governed by banking law. Ownership of personal property is governed by principles of property law. These are two entirely different things.

## II.

First, property law. Personal property may be owned by one person as a sole owner, or it may be owned by more than one person simultaneously. If owned by more than one person, the owners may be tenants in common, or they may be joint tenants. *See* NRS 111.063 (tenants in common in personal property); NRS 111.065(2) (joint tenants in personal property). The difference between the two is whether the ownership provides for a right of survivorship should one owner die during the tenancy. *See Smolen v. Smolen*, 114 Nev. 342, 344, 956 P.2d 128, 130 (1998) ("[T]he principal feature of the estate [is] the right of survivorship."). In Nevada, personal property may also take the form of community property when co-owned by husband and wife, but because Natko and the victim were never married, that classification has no relevance here.

The parties do not dispute (again, based solely upon arguments of counsel; we don't know what was proven at trial) that, before Natko's name was added to the existing account, every penny of the money deposited in it was the sole property of the victim. Natko agrees that she had no ownership interest in any of the money before her name was added to the account. However, she argues that once the account became joint, by operation of law everything in it became hers as a "joint tenant."

Maybe. But maybe not. The answer depends upon other evidence introduced at trial. Adding Natko's name to the joint account gave her coequal access to the money in it. Did it also give her legal title and permission to withdraw and spend it as she pleased? Not necessarily.

A foundational principle of property law is that possession is not the same thing as title. Legal title to personal property, and factual possession of it, are different things that can be severed from each other. A

COURT OF APPEALS
OF
NEVADA

(O) 1947B

4

person can legally possess property without owning it; it's the difference between a loan that conveys possession but not title, and a sale or gift that conveys both title and possession. It's why a house sitter doesn't become a legal owner of the home simply by residing overnight, and why a casino valet parking attendant doesn't own a car just by being handed the keys. Quite to the contrary, the civil tort of conversion occurs precisely when one person wrongfully exerts dominion over property that actually belongs to another. *See Golden Rd. Motor Inn, Inc. v. Islam*, 132 Nev. 476, 489, 376 P.3d 151, 160 (2016). Further, the crime of embezzlement occurs when, with criminal intent, a bailee entrusted with only possession and not ownership of personal property uses it for the bailee's own benefit as if he were the owner. *See* NRS 205.300.

A second foundational principle of property law is that title may transfer from one owner (a grantor) to another (a grantee) only if the grantor intended to convey such title. This has been settled law since 1865. *See Hendricks v. Perkins*, 98 Nev. 246, 250, 645 P.2d 973, 975 (1982) (examining whether evidence proved "the parties' intent to convey" an interest in the property); *Cox v. Glenbrook Co.*, 78 Nev. 254, 264, 371 P.2d 647, 654 (1962) (in determining whether property was conveyed to another, "the intention of the parties [is] the object of inquiry"); *Ruhling v. Hackett*, 1 Nev. 360, 367 (1865) (the extent of any transfer of property ownership is measured by "the intention of the parties"). Indeed, acting as if title to property has been transferred when the owner never intended to convey ownership is precisely when the tort of conversion and the crime of embezzlement occur.

Natko's argument thus runs afoul of long-established principles of property law: she argues that, under NRS 100.085, merely because she possessed legal authority to withdraw money from the joint account, the

Court of Appeals
of
Nevada

(O) 1947B

5

money actually belonged to her as a matter of property law. But this lumps together possession and ownership and makes property change title without any evidence of intent by the owner to do so.

What's more, she argues that the property not only changed title, but the form of the title changed from sole ownership to joint tenancy. Under Nevada law, a sole owner of property may convey a sole interest in the property to another simply by expressing an intent to do so and handing over possession. However, when the owner wishes to transmute the form of ownership from sole ownership into ownership by joint tenancy, Nevada law requires considerably more. At common law, creation of a joint tenancy required the "unities of interest, time, title, and possession," *Smolen*, 114 Nev. at 344, 956 P.2d at 130, meaning an intent to convey both title as well as possession without severing them, along with the unity of "time," which means both must be conveyed at the same time in the same transaction. *Id.* Beyond that, NRS 111.065 adds a writing requirement that did not exist at common law. This is so because the essence of joint tenancy is the "right of survivorship" that governs what happens when one of the joint tenants dies. Because many years or decades may go by before one tenant dies, Nevada law requires such transfers to be evidenced by "a written transfer, agreement, or instrument," so that the parties do not become embroiled in probate disputes years after the fact based upon oral statements whose contents may now be difficult to verify. *See* NRS 111.065(2). If any of these requirements is missing, then there is no proper conveyance in joint tenancy and what was conveyed was only either a tenancy in common or just sole ownership. *Smolen*, 114 Nev. at 344, 956 P.2d at 130.

We have no evidence that any of these requirements for creating a joint tenancy were ever met. So, for NRS 100.085 to make a joint

tenancy anyway, it must displace quite a lot of statutory and common law. But "[t]he Legislature is presumed not to intend to overturn long-established principles of law when enacting a statute [and] this court strictly construes statutes in derogation of the common law." *Shadow Wood HOA v. N.Y. Cmty. Bancorp. Inc.*, 132 Nev. 49, 59, 366 P.3d 1105, 1112 (2016) (internal quotation marks and citations omitted). To succeed, Natko needs NRS 100.085 to convey ownership of the victim's money to her whether or not the victim intended to give her a dime; whether or not he intended to convey title as well as possession; whether or not title and possession were conveyed in unity at the same time; whether or not anyone intended the account to be a tenancy in common instead of a joint tenancy; and whether or not any other formality of property law set forth in any other statute was followed.

To overcome these gaps and fill in the missing pieces, Natko argues that the victim's intent and all of the unities have already been established simply because once the victim agreed to comply with NRS 100.085(4) while constructively knowing what it said, he adopted and agreed to everything it imposed. In other words, by voluntarily agreeing to create a joint bank account under NRS 100.085, the victim constructively agreed to convey his money to Natko in joint tenancy because that's what the statute would make a joint account holder do. The way for the victim to avoid such a conveyance and keep the money for himself was not to deposit it into a joint bank account.

But this brings us to the next problem, which is that Natko's approach also conflicts with principles of banking law.

## III.

Bank accounts may be in the name of a sole account holder or they may be in the name of joint account holders. Under traditional principles of banking law, the form of the account, and the name it may bear, may have little to do with the beneficial ownership of anything deposited into the account. By way of example, trust accounts—such as an attorney trust account holding money for clients, or any other type of trust account used by agents or fiduciaries to hold money on behalf of principals— are classic examples of bank accounts that may bear the name of one person or entity but actually hold money beneficially owned by other people whose names appear nowhere on the accounts. Indeed, the body of federal crimes commonly known as "money laundering" punishes the act of attempting to conceal ownership of ill-gotten money by depositing it into bank accounts in the names of others while secretly retaining control of it. *See United States v. Davis*, 226 F.3d 346, 357 (5th Cir. 2000); *United States v. Rutgard*, 116 F.3d 1270, 1292 (9th Cir. 1997).

The point is that the name on an account may have little to do with who owns what's in it. Who actually owns the money in an account, both before and after it is deposited, is a question for the depositors and account holders to handle between themselves: "[g]enerally, the respective rights of the parties to a joint bank account are determined by the rules of contract law, and the intent of the parties with respect to the joint savings account is controlling." *Anderson v. Iowa Dep't of Human Servs.*, 368 N.W.2d 104, 109 (Iowa 1985). *See Brasel v. Estate of Harp*, 877 S.W.2d 923, 925 (Ark. 1994) (stating that "each owner's right to the funds may depend upon an agreement between them as to their ownership rights"); *see generally In re Estate of Greer*, 128 P.3d 1104, 1107 (Okla. Civ. App. 2005)

(stating that *"actual ownership of the funds*, as opposed to the right of possession, *is a question of intent"*).

Natko argues otherwise, but until now it's been long established that depositing money into a "joint account" does not automatically constitute a conveyance of money from the depositor to other account holders, either as sole owners or as joint tenants. "[A] person who deposits funds in a multiple-party account normally does not intend to make an irrevocable gift of all or any part of the funds represented by the deposit. Rather, he usually intends no present change of beneficial ownership." *Deutsch Larrimore & Farnish, P.C., v. Johnson*, 848 A.2d 137, 143 (Pa. 2004). Thus, money deposited in a joint bank account does not belong to other account holders absent "clear and convincing evidence" that the depositing party intended to confer such ownership. *Enright v. Lehmann*, 735 N.W.2d 326, 331 (Minn. 2007). Some states have held that the creation of a joint account established a rebuttable presumption of joint ownership (notably not a conclusive or irrebuttable one), and at one time Nevada employed such a presumption. *See Sly v. Barnett*, 97 Nev. 587, 589, 637 P.2d 527, 528 (1981). Courts in those states recognized that an irrebuttable presumption of the kind Natko proposes would create a "hardship . . . on parties having 'convenience' accounts, as where an incapacitated person might have a joint account for the sole purpose of financial management." *Id.* (Which, by the way, in view of the victim's alleged lack of mental capacity might be just what was intended here).

But it is simply not true that depositing money into a bank account by itself constitutes a transfer of ownership in the money to someone else just because their name also happens to be on the account, with no consideration of any evidence to the contrary no matter how weighty

or persuasive that evidence might be, and no opportunity for ownership to be disputed or challenged by any other party. *See id*; *see also South v. Smith*, 934 S.W.2d 503, 507 (Ark. 1996) ("[E]ven though one has a right to withdraw funds from a joint bank account, a joint tenant may not, by withdrawing funds in a joint tenancy, acquire ownership to the exclusion of the other joint tenant . . . ." (citation omitted)). Quite the opposite: a party who merely has his name on a joint account and proves nothing more "fail[s] to establish his ownership of all the funds in the joint accounts." *Marcucci v. Hardy*, 65 F.3d 986, 992 (1st Cir. 1995). Indeed, if one owner of a joint bank account tries to withdraw more from the joint account than he owns or is entitled to, the other account holders may sue him for the tort of conversion because he has taken something that was not his to take. *Newbro v. Freed*, 409 F. Supp. 2d 386, 395 (S.D.N.Y. 2006); *see Matter of Kleinberg v. Heller*, 345 N.E.2d 592 (N.Y. 1976); *see also Kettler v. Sec. Nat'l Bank*, 805 N.W.2d 817, 823 (Iowa Ct. App. 2011) (stating that "a cotenant may not withdraw from the account in excess of his interest; if he has done so, he is liable to the other joint tenant for the excess so withdrawn" (quotation and citation omitted)); *South*, 934 S.W.2d at 507 ("[W]hen one [joint account holder] withdraws in excess of his moiety, he is liable to the other joint tenant for the excess withdrawn.").

The Nevada Supreme Court long ago rejected the very argument advanced here, in which "plaintiff contends that by depositing the money in the joint account defendant made a valid, completed gift to the plaintiff." *Weeks v. Weeks*, 72 Nev. 268, 275, 302 P.2d 750, 753 (1956). It rejected this argument summarily, pointedly noting that no authority existed for this proposition but "literally hundreds of cases" stood for the opposite. *Id.* at 276, 302 P.2d at 754; *see Edmonds v. Perry*, 62 Nev. 41, 140

P.2d 566 (1943) (under prior statute, merely because a bank account is joint does not mean that it is intended to be a joint tenancy with right of survivorship). Since then, the Nevada Supreme Court's position has consistently remained the same right through 2016: money retains its original ownership even when deposited into a joint account, and consequently "[a] judgment creditor may garnish only a debtor's funds that are held in a joint bank account, not the funds in the account owned by the nondebtor." *Brooksby v. Nev. State Bank*, 129 Nev. 771, 772, 312 P.3d 501 (2013). This is simply because "joint bank account funds [may] truly belong to someone other than the judgment debtor." *Id.* at 773, 312 P.3d at 502; *see Brooks v. Mejia*, 2016 WL 197396, Docket No. 67794 (Order of Affirmance, Jan. 14, 2016) (concluding that creditor could not garnish account to pay off debt owed by other account holder because appellant successfully "demonstrated that the funds in the bank account belonged to her alone"). In other words, even when funds from different sources are commingled in a joint bank account, the ownership of the funds does not automatically change merely by being deposited in the joint account. Rather, even when commingled, the funds retain their original ownership status at least so long as ownership can be traced. *In re Christensen*, 122 Nev. 1309, 1323, 149 P.3d 40, 49 (2006) (ownership over funds stays unchanged even when commingled with other funds "so long as tracing is possible").

None of these cases makes any sense (and all would have to be overruled) if Natko is correct about what NRS 100.085 does. These cases make sense only if Natko is wrong. Indeed, they show, conclusively, that she is.

 

What a joint bank account does is give every account holder some right of access to the money. But access is not the same thing as ownership. "The joint owner of a bank account . . . has the right to withdraw all of the funds, thereby totally divesting the other joint owner of all interest. [But] the creator of a joint account has a cause of action against the other owner for having completely withdrawn the funds, upon establishing that in creating the account the creator did not intend to transfer [all of the funds]." *In re Rauh*, 164 B.R. 419, 424 (Bank. Ct. D. Mass. 1994); *see Kettler*, 805 N.W.2d at 823; *South*, 934 S.W.2d at 507. As another court described a virtually identical statute to NRS 100.085:

> The intent of [the statute] is to protect a financial institution from liability for distributing funds from a multiple-party account to any of the individual account holders. However, the relationship between a banking institution and the holders of a joint account does not in any manner shape the relationship between the account holders themselves. As such, while [one account holder] was authorized to withdraw the funds, she was not authorized to use the funds for her personal benefit.

*Sandler v. Jaffe*, 913 So. 2d 1205, 1207 (Fla. Dist. Ct. App. 2005). *See Erhardt v. Leonard*, 657 P.2d 494, 497 (Idaho Ct. App. 1983) (noting that "[a]ccount contracts . . . define the power of withdrawal held by each party to the account, as a means of protecting the financial institution," but that they do not affect the actual ownership of the funds therein, which is determined by looking to the intent of the depositor).

## IV.

Natko argues that she is right and all of this is wrong because NRS 100.085 overturned it all in 1995, when the statute was last amended; ever since then, none of these statutes or common law principles has applied to any money held in joint bank accounts.

If she is correct, that raises an interesting question: what happened to money that was deposited into joint bank accounts before 1995 and remained there after the amended statute took effect? Natko concedes that, prior to 1995, money deposited into a joint account was not necessarily held in joint tenancy, agreeing that the Nevada Supreme Court said exactly that in *Starr v. Rousselet*, 110 Nev. 706, 712, 877 P.2d 525, 530 (1994) (holding that "a simple reference to a 'joint' account . . . will not suffice for purposes of establishing a joint tenancy"). She argues, though, that money deposited into any joint account became automatically held in joint tenancy beginning in 1995 when the last amendment to NRS 100.085 took effect, thereby overruling *Starr* at least *sub silentio*.

Would this not be a governmental seizure of private property and conveyance to others of all money held in joint bank accounts at the moment the 1995 amendments took effect—possibly tens of millions of dollars of it across Nevada? Nev. Const. art. 1, § 8(5) stipulates that "[n]o person shall be deprived of . . . property, without due process of law," and art. 1, § 22 provides that "[p]ublic use shall not include the direct or indirect transfer of any interest in property taken in an eminent domain proceeding from one private party to another private party." Yet Natko seems to read the 1995 amendments as accomplishing something very much along those dangerous lines: taking all money deposited in any joint account before 1995 away from any original sole owner and giving it away in joint tenancy whether the owner wanted to or not.

Furthermore, it seems to me that this interpretation creates serious problems with the Contract Clause of the Nevada Constitution, which prohibits any "law impairing the obligation of contracts." Nev. Const. art. 1, § 15. Following Natko's reasoning, any contract governing the

ownership of money held in a joint account before 1995—say, a 1994 contract that provided that money held in a joint account was expressly not held in joint tenancy between the parties—would have been voided, ex post facto, by the 1995 amendment to NRS 100.085. That would make NRS 100.085 unconstitutional. But we're not supposed to read statutes that way; to the contrary, "when a statute may be given conflicting interpretations, one rendering it constitutional, and the other unconstitutional, the constitutional interpretation is favored." *State v. Kopp*, 118 Nev. 199, 203, 43 P.3d 340, 342-43 (2002) (internal quotation marks omitted).

Central to the concept of liberty in our constitutional republic is the right to freely convey or dispose of private property as the owner, not the government, sees fit. Indeed, the right to own real and personal property free from government interference is the individual right most frequently mentioned in the U.S. Constitution. *See* U.S. Const. amend. III (protecting "any house"); amend. IV (protecting "houses" from unreasonable search and seizure); amend. V (prohibiting deprivation of life, liberty, or "property" without due process of law, and preventing "private property" from being taken without just compensation); amend. XIV (prohibiting deprivation of life, liberty, or "property" without due process of law). Government ownership and control of property is the hallmark of communist societies, not free ones. Yet that comes perilously close to what Natko seems to propose here: that the Legislature can simply take one's private property and give it to someone else (or at least make the original owner share it with others against his will) by enacting a statute like NRS 100.085.

## V.

Natko argues that this is what NRS 100.085 demands. But the statute doesn't really say what she claims it does.

When reviewing statutes, we start with the statutory language and give it the meaning most reasonably supported by the text, structure, and context. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170, 174 (2012). If one is an "intentionalist" or "purposivist," one might also peek at the legislative history or announced purpose lurking behind a statute. But neither the stated purpose nor anything in the legislative history can ever override the plain meaning framed by the statute's own language and structure, because the language and structure were all that the Legislature voted on and all that the Governor signed.

As a starting point, the structure of NRS 100.085 tells us that it isn't the general all-purpose banking and property law statute that Natko says it is. Quite to the contrary, and quite notably, the general banking statute is located very far away, in NRS Chapter 657. The personal property statute is also located elsewhere, in NRS Chapter 111.

In contrast, NRS 100.085 is located within Chapter 100, a chapter directed specifically at "Special Relations of Debtor and Creditor," and NRS 100.085 is further located adjacent to a series of subchapters titled "Marshaling of Assets," "Suretyship," and "Transfer of Creditor's Rights." The statute is immediately preceded by a series of other statutes addressing "Agreements between principals and sureties for joint control of assets" (NRS 100.060); "Deposits authorized in lieu of cash payment or surety bond for protection of State" (NRS 100.065); and "Creditor's rights transferable without consent of debtor" (NRS 100.075). The statute immediately

following NRS 100.085 is NRS 100.091, titled "Impound account required under loan secured by real property . . . ."

What does this tell us? That NRS 100.085 doesn't govern how bank accounts are set up for all purposes, nor does it supplant centuries of common law (along with several current statutes) to dictate who owns personal property; this chapter would be a pretty incongruous place to bury a statute that revolutionary. Rather, being placed here tells us that it's much narrower and is directed toward problems that may arise in debtor/creditor relations. As the Nevada Supreme Court has described the statute, "[t]he effect of NRS 100.085(1) is to protect a depository, such as a bank, from liability if it pays money out to a joint tenant of an account." *Walch v. State*, 112 Nev. 25, 31, 909 P.2d 1184, 1188 (1996).

Structure aside, here are what the plain words of the statute say. Under NRS 100.085(1) and (3), any "deposit made in the name of [two or more persons] and intended to be paid or delivered to any one of them" is the property of all named persons that can be withdrawn by any account holder, and the bank will suffer no liability if the withdrawal turns out to have been against the wishes of other account holders. NRS 100.085(4) specifically states that, "[f]or purposes of this section," the bank may treat a "deposit" into a joint account as if it were intended in joint tenancy so long as the deposit was made in the name of one or more persons into the joint account, unless the "depositor" indicates otherwise.

Take these words at face value, and notice what they don't say: they don't say that all joint bank accounts create joint tenancies all the time. Here's why. There are three ways that money can end up in a joint account: it can be deposited in a sole account to which more names are added later to make it joint; it can be deposited into a joint account in the name of only

one account holder; or it can be deposited into a joint account in the names of multiple account holders. Yet NRS 100.085 addresses only one of these (the third). The plain words of NRS 100.085 state that the entire statute comes into play only when a joint account has already been established and a "deposit [is] made in the name of the depositor and one or more other persons." *See* NRS 100.085(1) ("When a deposit has been made in the name of the depositor and one or more other persons . . . ."); 100.085(3) ("When a deposit has been made in the name of the depositor and one or more other persons . . . .").

By its plain terms, NRS 100.085 isn't triggered by the initial creation of a joint account, but rather only by the making of certain kinds of deposits into one already established. That's the very title of the statute: "Deposits in names of two or more persons" (and not, by contrast, "joint bank accounts" or "joint tenancies"). Even NRS 100.085(4), the section that refers to joint tenancies (and upon which Natko most obviously hangs her hat), is triggered only by the actions of a "depositor" who makes the kind of deposit outlined in sections (1) and (3). In fact, here is the language from (4) that forms the backbone of Natko's entire argument:

> 4. For the purposes of this section, unless a *depositor* specifically provides otherwise, the use by the *depositor* of any of the following words or terms in designating the ownership of an account indicates the intent of the *depositor* that the account be held in joint tenancy . . . . (emphasis added).

On their face, these words don't apply to all joint bank accounts from inception but only when activated by the actions of a "depositor" following a deposit pursuant to (1) or (3). This would not be Natko if she never deposited any of her own money into the account herself in the specific manner provided by (1) or (3) (which she seems to concede); Natko couldn't

trigger this statute herself as a mere account holder who never made a deposit in the name of more than one person. Did the victim ever trigger section (4)? That depends on evidence we don't have before us.

But let's keep going through the text. What happens with the other two situations? Say no such deposits are made in the names of multiple account holders. Or, say deposits were made only back when the account was a sole account before it became joint. Notably, neither of these is covered by NRS 100.085(1), (3), or (4). The statute omits bank accounts that began as sole accounts and then were later converted into joint ones without any more deposits having been made. It also omits bank accounts that are joint, but in which no deposits have yet been made "in the name of the depositor and one or more other persons." These seem like rather glaring omissions, omissions that may potentially encompass thousands of joint accounts, weirdly making some bank accounts into joint tenancies but leaving out quite a lot of them.

So if NRS 100.085 creates joint tenancies at all (which I doubt, but let's assume it does for the moment), it does so only sporadically and unpredictably: some joint bank accounts are joint tenancies because the right kind of "deposit" was made into them; some joint bank accounts are not joint tenancies right now but may become joint tenancies in the future upon the making of the right kind of "deposit"; and some joint bank accounts may never become joint tenancies if the right kind of "deposit" is never made. That's a pretty odd scheme.

More pointedly, oddity aside, those omissions matter very much to this appeal because at least one of the situations omitted may be precisely the situation at hand. Here, the victim originally deposited what had unequivocally been his own money into a sole account and Natko's name

COURT OF APPEALS
OF
NEVADA

(0) 1947B

18

was added to the account only later. Absent a transcript it's not clear whether all of the money at stake was deposited before or after her name was added (your guess is as good as mine on the precise sequence of events). If all of the victim's money was deposited while the account was still sole, then there was never a deposit into any joint account made in the name of more than one person. If so, this case would be precisely one of the situations that the express words of NRS 100.085 would not cover, and Natko's interpretation of the statute leaves her own appeal out.

The strangeness of these results suggests something more broad: Natko is simply wrong about what the statute says. Why would a comprehensive banking and property statute omit so much and include so little? The answer must be: because NRS 100.085 is not the comprehensive banking and property statute that Natko argues it is. Rather, it is what *Walch* said it is: a statute that protects banks from liability. 112 Nev. at 31, 909 P.2d at 1188. It applies in only extremely limited circumstances, and says nothing about whether the mere creation of a joint account universally gifts every dollar deposited to everyone else whose name happens to be on the account. NRS 100.085(4) simply protects banks from being sued by a decedent's estate for allowing a surviving account holder to withdraw funds after the depositor has died and the bank mistakenly thought that a right of survivorship was intended. That's all it does. NRS 100.085(4) insulates the bank by allowing it to assume for purposes of the withdrawal that there existed a right of survivorship; but whether there actually was one is a matter to be resolved in probate court as a question of property law.

## VI.

If Natko wanted to prove that the money was hers, she could have done so by introducing evidence of the victim's intent to gift the money

COURT OF APPEALS
OF
NEVADA

(O) 1947B

to her, and perhaps the creating of the joint account may have constituted some evidence of such intent. But it did not become hers just by operation of law without any evidence that the victim intended a conveyance.

Alternatively, perhaps one might say that the creation of a joint bank account established a prima facie rebuttable presumption that the money in it might be intended to be held in joint tenancy. *See Sly*, 97 Nev. at 589, 637 P.2d at 528. But even then the jury must consider any and all evidence of intent offered to rebut that presumption.

Either way, NRS 100.085 is not the alpha and omega of the inquiry, with nothing more to ask. Accordingly, jury instruction 18 is more or less correct. It states that a person's status as a joint account holder by itself says nothing about who owns the money within the account or who can use it for their own personal benefit. That's manifestly true. Status as a joint account holder may constitute evidence pointing to ownership of the money. It may even create a rebuttable presumption of joint tenancy in some cases. But no legal conclusion can be drawn from the status itself, without anything more.

Although jury instruction 18 is poorly worded (including an obvious grammar and punctuation error), in substance it's a reasonable approximation of the law. It probably would have been more accurate had it stated that "a person's status as a joint account holder does not by itself provide lawful authority to use or transfer the assets in the account for their own benefit," or perhaps "a person's status as a joint account holder does not by itself convey legal ownership of the funds deposited in the account." But it's not that far off the mark. I do not think the district court erred in giving it, and therefore reversal is not warranted.

## VII.

Even if one could read NRS 100.085 as broadly as Natko proposes—to make the name on a bank account single-handedly preempt any other principle of property ownership—I would still affirm the conviction. Without a transcript of the trial, we have no idea what the State or Natko proved about the money in the bank account or the victim's capacity or intent to convey it. We also don't know whether jury instruction 18 related to the evidence introduced at trial or whether it may have been entirely superfluous and irrelevant to everything that happened below. Those gaps requires affirmance.

But there's more. The central issue in this case appeared to be that, at the time the joint account was created, the victim may have lacked the mental capacity to make any serious financial decisions. If the trial evidence confirmed this (we can only guess), the jury could have concluded that the establishment of the joint bank account itself occurred without the victim's legal consent, and if so, then any withdrawal from it thereafter was either void or at least voidable due to the victim's lack of capacity. If the account itself and any deposit into it or withdrawals from it were legally void, then Natko never legally owned the money even under her theory of NRS 100.085, because the victim lacked the mental capacity to give it to her. A rational jury could have concluded that Natko committed theft and exploitation by inducing the victim to convert his money into joint tenancy and thereby gift it to her at a time when he had no legal capacity to agree, and I would affirm on this basis as well as for the other reasons set forth herein.

 

## VIII.

For all of these reasons, I respectfully dissent. At common law, joint tenants could not steal from each other. But joint bank account holders might be able to, because not every joint bank account holder is necessarily a joint tenant to every penny ever deposited in the account by anyone at any time. In the absence of a trial transcript we simply do not know whether Natko was a joint tenant to the money deposited into the account, or whether she might have been a joint account holder without being a joint tenant. Consequently, we do not know whether any error occurred, and I would affirm the conviction.

_____, J.
Tao

COURT OF APPEALS
OF
NEVADA

(O) 1947B